## In re Mark and Pauline Kisiel

[772 A.2d 135]

No. 98-371

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed December 29, 2000

Motion for Reargument Denied March 22, 2001

*Paul Gillies* of *Tarrant, Marks & Gillies*, Montpelier, and *William H. Meub* of *Keyser Crowley, P.C.*, Rutland, for Appellants.

*Joseph S. McLean* of *Stitzel, Page & Fletcher, P.C.*, Burlington, for Appellee.

**Dooley, J.** Landowners Mark and Pauline Kisiel appeal the Environmental Board's decision denying their application for an Act 250 permit to subdivide and develop a 158-acre tract of land into five residential lots in the Town of Waitsfield. The permit was denied on several grounds, but landowners challenge only the Board's conclusion that their project was not in compliance with two provisions of the town plan. We conclude that, in reaching its challenged decision, the Board erroneously focused on the plan's vague and ambiguous language, while ignoring the Town's prior actions with respect to the project — which represented the local community's interpretation of, and response to, the plan's broad language. Accordingly, we reverse the Board's determination that the project did not comply with the town plan, and remand the matter for further proceedings.

The property in question is located at the end of Bowen Road, an unmaintained class 4 town highway, in the Town of Waitsfield on the western side of the Northfield Range. At the time landowners submitted their application for the five-unit subdivision, the Town's zoning ordinance permitted minimum five-acre residential lots on the subject parcel, which is situated within the Town's Forest Reserve District — defined as land in the Northfield Range with an elevation in

excess of 1500 feet.[1] The elevation of the project tract ranges from 1500 to 2000 feet, with the proposed construction occurring between 1500 and 1700 feet. To provide vehicular access to the project tract, landowners proposed improving 2400 feet of Bowen Road.

In February 1996, the Waitsfield Planning Commission granted subdivision approval for the proposed project. The Commission noted that its decision to grant a permit followed public discussions of the proposal on four occasions, a site visit, two public hearings, and deliberations by the Commission on four separate dates in late 1995 and early 1996. The subdivision permit contained more than twenty specific conditions, several of which concerned the proposed improvements to Bowen Road. The permit required landowners to pay for the upgrade and maintenance of the road. Further, to preserve the historic use of the trails that accessed Scrag Mountain Municipal Forest through landowners' property, the permit required landowners (1) to grant an unrestricted public trail easement through their property from the end of the road to the municipal forest, (2) to construct a trail along the easement that would allow public recreational uses such as hiking, biking, horseback riding, snowmobiling, and cross-country skiing, and (3) to construct a designated parking area for six to eight cars at the terminus of the improved road.

In January 1997, the Waitsfield Selectboard approved landowners' request to improve Bowen Road by granting them a Permit for Work in the Public Right of Way. Once again, the permit contained several conditions that reflected the Town's concern with preserving the historic uses of the roadway. The permit required landowners (1) to provide a public trail easement that would allow access to the municipal forest for various recreational uses, (2) to provide easements for logging and natural resources management, and (3) to construct a public parking lot that would facilitate public access to the forest through their property. The permit also stated that the improvements to the road would not "require the Town to upgrade Bowen Road's town highway classification." See 19 V.S.A. § 708(b) ("A class 4 highway need not be reclassified to class 3 merely because there exists

---

[1]There was testimony that, after granting landowners a permit to proceed with their development, the Town enacted interim zoning that prohibited residential development above 1700 feet and restricted such development between 1500 and 1700 feet to a conditional use.

within a town one or more class 3 highways with characteristics similar to the class 4 highway.").

. In November 1997, the District No. 5 Environmental Commission issued a land-use permit authorizing the subdivision under Act 250, 10 V.S.A. §§ 6001-6108. Notwithstanding the earlier permits granted by the Town, the Town appealed the Commission's decision to the Board, which received extensive prefiled testimony, conducted a site visit, and held an evidentiary hearing. In June 1998, the Board issued its decision, ruling that the application complied with several of the criteria contained in 10 V.S.A. § 6086(a), but failed to comply with others, including criterion (10), which requires "conformance with any duly adopted local or regional plan." *Id.* § 6086(a)(10). The Board found, in this regard, that the proposal to upgrade Bowen Road was not in compliance with the plan's goal of maintaining the "status" of class 4 roads, and further found that the proposal was inconsistent with the goal of precluding development on "steep" slopes. In response to a subsequent motion to alter, the Board amended several of its findings, but otherwise reaffirmed its decision denying the application. This appeal followed.

We have decided a number of cases involving the compliance of a development proposal with criterion 10 of Act 250, which requires that the proposed development be "in conformance with any duly adopted local or regional plan." 10 V.S.A. § 6086(a)(10). Before we examine the specifics of the plan provisions before us, we find it instructive to review two of those decisions, which we find central to the resolution of this case.

The first is *In re Green Peak Estates*, 154 Vt. 363, 577 A.2d 676 (1990), in which we upheld a decision of the Environmental Board that the second and third phases of a subdivision development were not in conformance with either the town or regional plan. The facts of *Green Peak Estates* have some similarities to the facts of this case because the developer was attempting to develop residential lots in a higher-elevation undeveloped area. Unlike this case, however, the town had no subdivision regulations, and the planning commission opposed the development as inconsistent with the town plan. Moreover, the regional plan specifically provided that "[o]n slopes greater than 20%, residential development should not be permitted." *Id.* at 368, 577 A.2d at 679. The Board found that this specific provision of the regional plan was consistent with the more general provisions of the town plan that established an objective of keeping the "rugged and poorly accessible mountain and forest areas free from development." *Id.* Because at

least half of the proposed subdivision was to be located on a slope exceeding 20 percent, the Board found that the development did not conform with the regional plan. We affirmed, holding that "the Board's commonsense interpretation of the plan's policy on this point is consistent with the overall approach to use of the region's intermediate uplands." *Id.* at 369, 577 A.2d at 679.

The second decision is *In re Molgano*, 163 Vt. 25, 653 A.2d 772 (1994), in which the Board also found a development proposal was not in conformance with a town and regional plan. This time, however, we reversed the Board's decision because of two critical elements not present in *Green Peak Estates*. First, the town had adopted specific zoning ordinances consistent with the town plan and had issued a zoning permit to the developer under these ordinances. Second, the language of the town plan on which the Board relied was "broad," "nonregulatory," and "at best, ambiguous" with respect to the issues before the Board. *Id.* at 29-30, 653 A.2d at 775.

Regarding the first difference, we found error in the Board's holding that the zoning ordinances and decisions were irrelevant to criterion 10 review, noting that implementation of a town plan is done through zoning ordinances so that the ordinances control the plan. We concluded:

> Because the Board's interpretation would effectively give nonregulatory abstractions in the Town Plan the legal force of zoning laws, we agree with Molgano that the Board erred as a matter of law in concluding that the Town's zoning bylaws were not germane to the meaning of the Town Plan.

*Id.* at 31, 653 A.2d at 775.

As suggested in the above quote, we also found error in the Board's holding with respect to the second difference. In discussing language from the regional plan, which we found to be "broad and vague," we distinguished *Green Peak Estates* as involving "a specific policy against [the] type of development" at issue. *Id.* at 31, 653 A.2d at 776; see also *In re MBL Assocs.*, 166 Vt. 606, 607, 693 A.2d 698, 700 (1997) (mem.) (language of regional plan should be enforced under criterion 10 when it is "clear and unqualified, and creates no ambiguity").

The case can be resolved based on the distinctions between *Molgano* and *Green Peak Estates*. We first turn to the specific plan provisions, and the claims of the parties with respect to them, starting with the Board's holding that the development was not in conformance with the plan's provisions concerning developments on steep slopes. The Board

found that the project was not in compliance with Objective 2.a of Goals 1.1 and 1.2 found in section IV of the town plan. The latter goals relate to the preservation and responsible use of the Town's natural features and resources. The Objective in question provides as follows:

> Objective 2. To protect Waitsfield's fragile resources and sensitive natural areas and reduce environmental hazards and prevent the loss of life and property from flooding.
>
> a. Prevent the creation of parcels which will result in development on *steep slopes*, critical wetlands and floodplain; and consider amending the Waitsfield Zoning Bylaws to create standards to prevent such development.

(Emphasis added.)

In challenging the Board's conclusion that their project failed to comply with Objective 2.a, landowners rely primarily on subsection 1.2 of section III of the Town plan dealing with "fragile features" of the environment. This section cautions that "steep slopes and hillsides" are generally unsuitable for development because of problems relating to sewage disposal and soil erosion, as well as the potential impact on scenic landscape and wildlife habitat. Although the section does not specifically define "steep" slopes, it characterizes certain gradients as follows:

> Generally, slopes with a gradient of 0-6 percent are considered slight; 6-15 percent, moderate; 15-25 percent, severe; and greater than 25 percent, extreme. Consideration of soils conditions and erosion control are extremely important prior to development, with the steepest slopes being unsuitable for development. Resource Map 2 shows those areas which are characterized by severe and extreme slopes.

Landowners emphasize that, with the exception of a portion of one driveway, their project would be confined to slopes ranging between 5-20 percent, and therefore below what the plan characterized as "extreme." The Board rejected this argument below, indicating that construction on gradients characterized as "severe" (15 to 25 percent) was sufficient to establish noncompliance with the Objective to prevent development on steep slopes.

There is no doubt that the Town could limit or preclude development on steep slopes for sound reasons of soil conservation, sewage disposal, view preservation, and the like. This is, of course, the holding of *Green*

*Peak Estates*. But, unlike the regional plan in *Green Peak Estates*, the Waitsfield town plan does not specifically define a "steep" slope; nor does the Town's zoning ordinance provide any specific standards. The parties are thus left to debate the Town's intent, with landowners claiming that the Town intended to apply the prohibition only to "extreme" slopes with grades over 25 percent, and the Town asserting that the prohibition includes slopes characterized as "severe," i.e., having grades between 15 and 25 percent. The Board's decision did not elaborate on the basis of its ruling, and nothing in the plan — or the zoning ordinance — provides contextual guidance on this point.

■ As we explained in *Molgano*, 163 Vt. at 30, 653 A.2d at 775, zoning bylaws are designed to implement the town plan, and may provide meaning where the plan is ambiguous. Conversely, in the absence of pertinent zoning bylaws, the Board may not "give nonregulatory abstractions in the Town Plan the legal force of zoning laws." *Id.* at 31, 653 A.2d at 775. This is precisely what the Board did here. The town plan sets forth an abstract policy against development on steep slopes, but provides no specific standards to enforce the policy. Indeed, the plan itself acknowledges this deficiency; it expressly recommends within the steep-slope section that the Town "consider amending the Waitsfield Zoning Bylaws to create standards to prevent such development." Nothing in the record, however, indicates that the Town has enacted such standards.[2] Absent some objective measure to guide enforcement of the steep-slope prohibition, there was no basis for the Board to conclude that the project was not in compliance with this policy. Cf. *Green Peak Estates*, 154 Vt. at 368, 577 A.2d at 679 (enforcing specific standard prohibiting development on slopes in excess of 20 percent). Thus, we agree with landowners that the Board erred in concluding that the project was not in compliance with Objective 2.a of the town plan relating to steep slopes.

The Board's second determination that the development does not conform to the town plan concerns the Town's goal of maintaining the "status" of class 4 roads. One of the goals listed in the town plan, Goal 5.2, is: "The improvement and expansion of alternative, non-automobile transportation modes." Among the objectives designed to achieve this goal is Objective 4: "To provide alternatives to the heavy

---

[2] Apparently, as noted above, the interim zoning enacted subsequent to landowners' permit application prohibited residential development above 1700 feet and restricted such development above 1500 feet. There was no evidence that the ordinance addressed steep-slope standards.

reliance on individual automobiles." Subpart *g* of this objective provides as follows: "Maintain the current *status* of all class four Town Highways to promote their use for walking, bicycling and horseback riding." (Emphasis added.)

The inventory and analysis section of the town plan (section III) that precedes the stated goals and objectives includes the following paragraphs on roads and residential development within the Forest Reserve District:

> The forest reserve district includes the least accessible areas of town. Few roads provide access, most of those being unmaintained class 4 roads (such as . . . Bowen Road . . .). However, proposals to *upgrade* these roads *to class 3 status* have been made in recent years, and the subdivision of large parcels for residential development has resulted in the construction of private roads. Should these trends continue the current character of the forest reserve district could be significantly altered. Road improvements would likely result in increased pressure to subdivide large parcels for year-round residences, and could lead to the fragmentation of existing habitat . . . .

> Because of the geographic conditions throughout this district, road improvements are expensive and difficult to maintain. This is exacerbated by the distance from other Town roads and services. Further, emergency vehicle access is difficult on steep, narrow roads, and the potential for conflict between automobile traffic and logging operations exist in this area. Existing class 4 roads, and certain private logging roads, also provide exceptional recreation opportunities, including hiking, biking, horseback riding and hunting access to remote areas. This experience could be diminished through increased automobile access.

> . . . .

> In order to limit the adverse impacts of additional residential development in this district, the *upgrade of roads* and subdivision of large forest parcels *should be discouraged.* If residential development does occur, careful site selection and screening of new homes should occur, and landowners should be encouraged to restrict further subdivision of large parcels.

(Emphasis added.)

Another part of the inventory and analysis section of the plan concerning transportation includes the following language:

> Class 4 roads provide excellent walking opportunities, especially in the Northfield Range where such class 4 roads as the Bowen Road . . . offer access to largely undeveloped mountains. . . .
>
> In addition to class 4 roads, many miles of private logging roads and trails are available to the public through the generosity of landowners. However, many of these private roads are at risk of being posted and access prohibited as landowner-user conflicts arise. . . .
>
> In the future the Town may explore the potential for formalizing many of these informal trails through the dedication of permanent easements. The continuing subdivision of land poses both a risk to this informal network *and an opportunity to encourage path easements as a condition to subdivision approval.*

(Emphasis added.) This language supports Objective 3.j (Goal 6.2) of the plan to "secure permanent access to traditional hiking trails in Town, including trail access to the Scrag Municipal Forest from both the north and the south."

In its decision, the Board focused on the word "status" in Objective 4.g, concluding that it was not synonymous with the word "classification." According to the Board, improving a previously unmaintained class 4 highway to the extent that it could handle vehicular traffic would violate the plan's stated objective of "maintain[ing] the current status of all class four Town Highways to promote their use for walking, bicycling and horseback riding."

Landowners argue that the Board has erroneously defined the word status to mean the condition of the road rather than its legal classification. They note that the word "status," when used in connection with highways, often describes legal or statutory standing. See, e.g., *In re Bill*, 168 Vt. 439, 442, 724 A.2d 444, 446 (1998) ("The parties agree that the present-day legal status of the disputed highway segment turns on the validity and legal effect of the 1926 selectboards's purported discontinuation of the highway . . . ."); *Pillsbury v. Town of Wheelock*, 130 Vt. 242, 244, 290 A.2d 42, 44 (1972) ("It appears that the land crossed by the trail and now restored to

public highway status may be still subject to an annual lease payment to Dartmouth College."). Other language in the plan supports this argument. As indicated above, a related section refers to "proposals to *upgrade* these roads *to class 3 status*," thereby suggesting that the word "status" in Objective 4.g means classification.

We recognize that the Board is required to follow ordinary rules of statutory construction in construing the plan, and that we must accord great deference to the Board's decision. *In re MBL Assocs.*, 166 Vt. at 607, 693 A.2d at 700-01. Nevertheless, we conclude that the landowners' position must prevail over the Board's interpretation of the plan in this instance for a number of reasons.

■ First, although the Board relied upon the most specific and concrete expression of the plan's policy on class 4 roads, other expressions of the policy contained in the plan are far less specific or definitive. As with the policy on steep slopes, there is little specificity on how the class-4-road policy should be enforced and, indeed, the enforcement language is quite tentative. We conclude that the meaning of the plan is ambiguous.[3] This conclusion is underscored by the candid admission of counsel for the Town that differences in meaning urged by it and landowners are "subtle."

In contrast to the town plan in *Green Peak Estates*, which provided that certain development should not be permitted, here the plan provides that the upgrade of roads "should be discouraged." Thus, we are concerned that in addition to attempting to construe and apply an ambiguous plan, the Board has also given "nonregulatory abstractions in the Town Plan the legal force of zoning laws," action that we criticized in *Molgano*, 163 Vt. at 31, 653 A.2d at 775.

Second, and more important, the central teaching of *Molgano* is that where there is ambiguity in the wording of a plan, the Board must look to the interpretation of the plan by the municipal bodies responsible for its implementation and enforcement. When we look at what the Town of Waitsfield has done, and what it has not done, with respect to the development before us, we conclude that this evidence strongly supports landowners' position.

---

[3] The dissent finds the plan language "concrete and precise," 172 Vt. at 138, 772 A.2d at 145, primarily by rephrasing the terminology to say that the plan restricts upgrading the "condition" of the road rather than its "status." We agree that if the drafters of the plan had used the word "condition," it would be precise. They chose instead to use the ambiguous word "status," causing the disagreement.

As described above, both the Waitsfield Planning Commission and the Waitsfield Board of Selectmen reviewed this development proposal. Both approved of landowners' plans to improve Bowen Road without upgrading its classification to class 3. Both resolved the conflict between use of the road by automobiles and by hikers, bikers, snowmobilers or horseback riders by requiring landowners to construct a public trail along the road for nonautomobile uses. Both used the permit decisions before them to secure "trail access to the Scrag Municipal Forest," a specific objective of the town plan. In making the many discretionary decisions involved in its evaluation of landowners' subdivision proposal, and in the formulation of the twenty specific conditions it imposed, the planning commission was required to "refer to the goals, objectives, and policies . . . established by the Town plan in making discretionary decisions." Waitsfield Subdivision Regulations § 3.1. The selectboard, acting pursuant to its power to control the maintenance of roads, see 19 V.S.A. § 303, faced precisely the same decision as the Board — whether to allow landowners to improve Bowen Road for automobile travel to their development — and issued the permit to allow the development. These municipal actions are directly contrary to the plan interpretation accepted by the Board.[4]

■ We also find that what the Town chose not to do supports landowners' interpretation of the plan. For all practical purposes, the interpretation adopted by the Board would ban further residential development within the Forest Reserve District by the intentional continuation of bad and impassable roads, even though the provisions of the town plan plainly contemplate limited development, and the zoning ordinance in place at the time of landowners' application allowed residential development as a permitted use.[5] See *Molgano*, 163 Vt. at 33, 653 A.2d at 776-77 ("where . . . a developer diligently pursues a proposal through the local and state permitting processes before seeking an Act 250 permit, conformance under § 6086(a)(10) is

---

[4] The dissent argues that we should ignore the Town's actions because landowners failed to raise this argument in their brief. We find that landowners did raise these points, albeit briefly, in their main brief and more particularly in their reply brief. More importantly, landowners established the record of the Town's prior actions that serve as the basis for this argument.

[5] We do not agree that the plan bans subdivisions but not single family homes, as the dissent surmises. Whether landowners constructed one home or more, the Board's interpretation of the plan would prevent them from reaching their property by automobile.

to be measured with regard to zoning laws in effect at the time of a proper zoning permit application"). The Town's implementation scheme to allow residential development in the district, but to regulate it through the subdivision and road improvement permit process, is blocked by the Board's determination that no development can occur, a determination based on the Town's own plan.

The purpose of Act 250 "is not to supersede local regulation" of land development. See *In re Trono Constr. Co.*, 146 Vt. 591, 593, 508 A.2d 695, 696 (1986). Although Act 250 gives to the Board, and this Court on appeal from the Board's decisions, the power to override a town's implementation of its own plan, this power should be exercised only when the local construction of the town plan is plainly erroneous. No other policy will maintain local control of land use planning and promote fairness and consistency in state and local regulatory review. We must give deference to the determination of the Board, but the Board in turn must give deference to the determinations of local bodies in applying the plan.[6]

---

[6]The dissent argues that no deference should be given to the interpretation of the town bodies that administer the plan, including the selectboard that adopted it, because landowners have failed to show that those bodies have consistently employed this interpretation over a period of time. For three reasons, we find this position to be erroneous.

First, we have routinely given deference to the interpretation of statutes or rules by agencies responsible for their administration without requiring evidence that the interpretation had been stated in the past or applied in other cases. See, e.g., *In re Smith*, 169 Vt. 162, 169, 730 A.2d 605, 611 (1999) (statutes); *Hogan v. Department of Soc. & Rehab. Servs.*, 168 Vt. 615, 617, 727 A.2d 1242, 1244 (1998) (mem.) (statutes and rules).

Second, the dissent's rule is illogical and would result in poor public policy. It would require us to give deference to the Environmental Board's interpretation of a town plan that it did not draft, that it had probably never seen before, and that it was not responsible for implementing. On the other hand, the Board would not have to give deference to the Town's interpretation of the plan it drafted and regularly administers because the landowners failed to show that the Town had rendered this interpretation on multiple occasions in the past. Such a rule would be inconsistent with the reason for giving deference to the Town and would result in the Board superseding local regulatory decisions.

Third, from the landowners' perspective, this is one long permitting proceeding beginning in the planning commission and selectboard and continuing through the district commission and Environmental Board. See *Molgano*, 163 Vt. at 33, 653 A.2d at 776-77. We would create a regulatory maze if we routinely allowed one interpretation of a town plan to control at the beginning of the permit process and a different, and opposite, interpretation to control at the end. It is one thing to say that the Town's application of a plan in one case is not authoritative in another — it is quite another to say, as the dissent

We recognize that we are endorsing the primacy of local determinations as to the meaning of town plans in a case in which the Town is arguing that its implementation of its plan should be ignored. For whatever reasons, the Town is attempting, through Act 250, to undo its own regulatory decisions, without attempting to reopen them in the Town processes. The only explanation in the record lies in the testimony of the chairman of the planning commission that (1) the Town has now adopted an interim zoning ordinance prohibiting residential development on land at an altitude above 1700 feet and requiring conditional use approval for development of land lying between 1500 and 1700 feet, and (2) the Town has more information as a result of the Act 250 process in the way of "environmental impact and scientific knowledge," specifically on the water issues and the visual impact.

The Town is certainly entitled to insist that the Board thoroughly review all the relevant criteria of Act 250 with respect to the development proposal. It is not entitled, however, to use Act 250 to retroactively apply its new zoning regime to a development to which it is not applicable. See *Molgano*, 163 Vt. at 32-33, 653 A.2d at 776 (conformance with town plan must be determined as of "the time of the local processes"). In attempting to stop a development by using criterion 10, the Town is in no different position from any other party and must confront the inconsistency with its own regulatory actions. It has failed to do so here.

■ We hold that when the language of the Waitsfield town plan is reviewed in light of its application by the regulatory bodies responsible for its implementation within the Town, it cannot be construed to prohibit the improvement of Bowen Road as part of landowners' development proposal. Thus, we conclude that the Board erred in holding that the proposal violated criterion 10.

*Reversed and remanded.*

**Amestoy, C.J.,** dissenting. I agree with the majority's conclusion that neither the Waitsfield town plan nor its zoning ordinance provides sufficient contextual guidance to determine whether the Town intended to apply the prohibition against "steep slope" development to

---

does, that it is irrelevant in later actions in the same case. The dissent only emphasizes this point by noting that landowners went to the planning commission three times to achieve an acceptable development plan that could command the vote of a majority of that body.

"severe slopes" (i.e., slopes having grades between 15 and 25 percent) or only "extreme" slopes (i.e., slopes having grades over 25 percent). I concur, therefore, in the determination that the Environmental Board erred in concluding that the proposed subdivision violated the "steep slope" provision of the town plan.

I do not agree with the majority's conclusion that the Board erred in determining that the road improvements necessary for vehicular access to a proposed five-lot subdivision in the Town's Forest Reserve District would violate the town plan's stated objective of "[m]aintain[ing] the current status of all class four Town Highways to promote their use for walking, bicycling and horseback riding." As the record makes clear, the Board's decision was consistent with the plan, the zoning ordinance, and traditional usage within the Forest Reserve District, which together evinced a clear policy of allowing *limited* residential development and seasonal homes, but discouraging multi-unit subdevelopments of the kind at issue here. Therefore, I would affirm the decision of the Board denying landowners' application for an Act 250 permit.

I.

This case was tried and appealed as a straightforward issue of textual interpretation. In connection with their proposed subdivision project, landowners planned to upgrade approximately 2400 feet of Bowen Road, an unmaintained class four road, through substantial widening and drainage improvements. The issue before the Board was whether the proposed upgrade was consistent with the town plan, one objective of which was to "[m]aintain the current status of all class four Town Highways to promote their use for walking, bicycling and horseback riding." Landowners argued that "maintain the current status" does not mean "maintain the current physical condition," but rather maintain the class four "legal classification." In support of their contention, landowners cited several cases and statutes which appear to employ the term "status" as the functional equivalent of legal classi-fication, and two other sections of the town plan which arguably provided contextual support for their position.

The Town argued, and the Board found, that the meaning and purpose of the restriction was to restrict the physical improvement of class four roads. Reading the plan as a whole made plain that the goal of the restriction was not merely to maintain Bowen Road's "legal" status, but to preserve the character of the Forest Reserve District. The plan cautioned that improving the few unmaintained roads in the

district could significantly alter its unspoiled character by creating pressure for substantial development, and that existing recreational opportunities such as horseback riding, hiking, bicycling, and hunting "could be diminished through increased automobile access."

The majority argues, however, that regardless of the Board's conclusion, the restriction on upgrades of class four roads constitutes little more than a "nonregulatory abstraction" of the kind criticized in *In re Molgano*, 163 Vt. 25, 31, 653 A.2d 772, 775 (1994). The argument was not advanced by landowners at trial or in their appellate briefs. The reason is clear. The provision restricting upgrades on class four roads is concrete and precise. The Town's objective is to *maintain* the existing condition of class four roads, particularly in the Forest Reserve District, in order to limit vehicular access and development, and to preserve existing recreational opportunities and open space. There is nothing abstract about this policy and objective.

This Court has uniformly applied a deferential standard to decisions of the Environmental Board. "We . . . defer to the Environmental Board's conclusions of law if they are rationally derived from the correct interpretation of law and findings of fact based on substantial evidence." *In re Commercial Airfield*, 170 Vt. 595, 595, 752 A.2d 13, 14 (2000) (mem.). Read as a whole, the town plan clearly supports the Board's conclusion that the objective of the restriction on class-four road upgrades was to preserve the physical condition of the roads in the Forest Reserve District in order to inhibit vehicular access, limit development, preserve the unspoiled character of the district, and enhance recreational opportunities. Maintaining the legal classification of the road while transforming its physical characteristics to accommodate substantial vehicular traffic plainly undermines the purpose of the restriction. Thus, the Board's conclusion that the proposed upgrade was inconsistent with the town plan was amply supported, and should be affirmed. See *In re MBL Assocs.*, 166 Vt. 606, 607-08, 693 A.2d 698, 701 (1997) (mem.) (affirming Board's interpretation of regional plan to conclude that proposed subdivision was consistent with plan).

## II.

Notably absent from landowners' pleadings and briefing was any assertion that the Town's initial decision to grant a subdivision permit for the project somehow provided authoritative evidence of the Town's underlying legislative intent with respect to the meaning of "status." It is not difficult to understand this omission. Although this Court has recognized that municipal actions may provide some indication as to

the meaning of local zoning regulations, see *In re Duncan*, 155 Vt. 402, 408, 584 A.2d 1140, 1144 (1990), the test is whether there has been "a *consistent interpretation* of the provision by the local officials who administer it." *In re Vermont Nat'l Bank*, 157 Vt. 306, 313, 597 A.2d 317, 320 (1991) (emphasis added); see also *In re Chatelain*, 164 Vt. 597, 598, 664 A.2d 269, 270 (1995) (mem.) (relying on *Vermont National Bank* to hold that "there is 'no indication of a consistent interpretation of the [zoning] provision' to which we must give deference").

The "consistent interpretation" requirement reflects the general rule that courts may defer to administrative interpretations of zoning ordinances where the record demonstrates a consistent application of the ordinance *over time*. The principle was cogently summarized in *Sinelli v. Birmingham Board of Zoning Appeals*, 408 N.W.2d 412 (Mich. Ct. App. 1987), as follows: "In cases of ambiguity in a municipal zoning ordinance, the *past practical construction over an extensive period* by the officer or administrative agency charged with its administration is to be accorded great weight in determining its meaning." *Id.* at 414 (quoting 82 Am. Jur. 2d, *Zoning & Planning* § 66) (emphasis added); see also *Clark v. Town Council*, 144 A.2d 327, 332 (Conn. 1958) ("The practical construction placed *over the years* upon ambiguous language in legislation by those charged with its administration becomes weighty evidence of what the law is.") (emphasis added); *Exxon Corp. v. Board of Standards*, 515 N.Y.S.2d 768, 773 (App. Div. 1987) ("courts should give due consideration to an agency's practical construction of a statute *over a period of time*") (emphasis added).

Without so much as acknowledging the applicable case law, much less the fact that the argument was never raised, the majority here conclude that the Town's actions in issuing a subdivision permit and subsequent work permit represented a persuasive "interpretation of the plan by the municipal bod[y] responsible for its implementation and enforcement." 172 Vt. at 133, 772 A.2d at 142. Indeed, the majority characterize the Town's actions as the "most important" source of the provision's meaning. *Id.* In so concluding, the majority point to nothing in the record evidence demonstrating a consistent interpretation of the provision over time by the local officials who administer it. They cite no evidence of prior instances in which the Town has approved similar class-four road improvements for developments in the Forest Reserve District. Cf. *Sinelli*, 408 N.W.2d at 414 (noting that town had demonstrated consistent interpretation of its ordinance through affidavit of building official "listing several specific instances" in which

town had taken similar actions). Accordingly, the majority's reliance on the Town's decision to issue two permits, in this one matter, as persuasive evidence of legislative intent, is entirely misplaced.

It bears mention, additionally, that the Town's actions here were hardly consistent. Although the majority notes that a subdivision permit with nineteen conditions attached ultimately did issue, it does not indicate that landowners' initial application was denied. Landowners later submitted another application, only to withdraw it voluntarily in the face of substantial concerns expressed by the Town planning commission. A third application was eventually approved, after extensive discussion and negotiations, by a five-to-three vote of the planning commission. Thus, the majority's assertion that the discrepant decisions of local officials in this case "strongly supports landowners' position," 172 Vt. at 133, 772 A.2d at 142, and is, therefore, the most significant evidence of the Town plan's meaning, will surprise the landowners as well as the Town.

Nor, finally, is it accurate to maintain — as the majority does — that this is an argument "that no deference should be given to the interpretation of the town bodies that administer the plan." *Id.* at 135 n.6, 772 A.2d at 143 n.6. Where an agency's interpretation of a statute would clarify the issue when "[t]he statute itself obviously does not speak with any clarity to the situation," reliance on the agency's interpretation is appropriate. *Hogan v. Department of Soc. & Rehab. Servs.*, 168 Vt. 615, 617, 727 A.2d 1242, 1244 (1998) (mem.).

Here, however, the majority is adopting an interpretation of the Town plan in direct opposition to the Town's interpretation in this lawsuit, and then faulting the dissent for not giving deference to the Town. It is deference to the Town's interpretation — not the majority's — that is required. To the extent the Town's application of the class-four road provision may be said not to "speak with any clarity to the situation," *id.*, the appropriate recourse to an administrative interpretation is to the construction of the Town plan asserted by the Town and adopted by the Environmental Board in this case.

## III.

The majority further asserts that the Board's interpretation of the plan effectively "ban[s]" all development within the Forest Reserve District, contrary to the zoning ordinance. 172 Vt. at 134, 772 A.2d at 143. This is also an argument not found in landowners' briefs. The reason, of course, is that the Town has never prohibited residential development within the Forest Reserve District consistent with the

preservation of existing resources and infrastructure. As various Town officers explained below, the Town's objective is to restrict residential land subdivisions of large forest parcels that will require substantial upgrades and services, and that might impact the fragile resources and character of the district. These kinds of projects are to be distinguished from more limited residential development of single dwellings for seasonal use that do not require such extensive improvements.

Much of the majority's rationale appears to be rooted in unspecified suspicions about the Town's motives. See *id.* at 136, 772 A.2d at 144 ("For whatever reasons, the Town is attempting, through Act 250, to undo its own regulatory decisions . . . ."). I acknowledge that landowners' lengthy struggle to obtain permit approval for a controversial development has prompted varied attempts to accommodate the landowners and the Town, but I do not — as the majority does — conclude that the Town is illegitimately attempting to "retroactively apply its new zoning regime to a development to which it is not applicable." *Id.* The very "regulatory" decisions which the majority accuses the Town of attempting to "undo" contained specific language preserving the Town's right to object to landowners' project. The permit for the Bowen Road improvements stated that the selectboard was not "making either an express or implied statement regarding the appropriateness of [the] proposed five-lot subdivision; nor does it waive any of its rights to represent the interests of the Town in any proceedings, legal or otherwise, relative to this matter." The subdivision permit itself contained nineteen specific conditions, and Town officials indicated at trial that their position was grounded, in part, upon indications that landowners did not intend to comply with the conditions.

The majority accurately notes that the purpose of Act 250 "is not to supersede local regulation" of local development. *Id.* at 135, 772 A.2d at 143. Here, the Environmental Board was careful not to do so. The majority was not. I respectfully dissent.