NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 28

No. 24-AP-239

| | |
|---|---|
| In re Wheeler Parcel Act 250 Determination (James M. Leas et al., Appellants) | Supreme Court |
| | On Appeal from Superior Court, Environmental Division |
| | March Term, 2025 |

Thomas G. Walsh, J.

Alan Luzatto, President, Villas at Water Tower Hill HOA, Pro Se, Jeanne Zagursky, Representative, Neighbors Committee to Stop Neighborhood Blasting, Pro Se, and James Marc Leas, Pro Se, South Burlington, Appellants.

Christopher D. Roy of Downs Rachlin Martin PLLC, Burlington, for Appellee JAM Golf, LLC.

Colin K. McNeil, City Attorney, South Burlington, for Appellee City of South Burlington.

PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Toor, Supr. J. (Ret.), Specially Assigned

¶ 1. **REIBER, C.J.** Neighbors[1] appeal the Environmental Division's decision affirming the District 4 Environmental Commission's granting of an Act 250 permit amendment to landowner JAM Golf, LLC[2] for the proposed construction of a housing development on a lot

---

[1] Appellants, referred to collectively as neighbors, are Villas at Water Tower Hill Homeowners' Association, Neighbors Committee to Stop Neighborhood Blasting, and James Leas.

[2] At the time the permit application was filed, BlackRock Construction LLC was the applicant and JAM Golf, LLC owned the property. In October 2024, this Court granted a motion to substitute landowner JAM Golf as the appellee in this matter because BlackRock divested itself

that was formerly part of the Wheeler Nature Park in South Burlington, Vermont. Neighbors claim that landowner was required to show changed circumstances to amend the permit and the development did not comply with Act 250 Criteria 8 and 10. We conclude that the permit-amendment argument was not preserved and that the Environmental Division's findings regarding the relevant Act 250 criteria were supported by the evidence. We therefore affirm.

## I. Background

¶ 2.     This case arises from the permitting of a proposed thirty-two-unit residential development to be sited on a 6.91-acre parcel of land (Project Parcel) in South Burlington. The Project Parcel was formerly part of the adjacent City-owned Wheeler Nature Park. In a 2015 agreement, JAM Golf agreed to convey to the City a 21.88-acre parcel running along the easterly side of the Vermont National Country Club development in exchange for the conveyance of the Project Parcel property. Additionally, the City agreed to pursue the enactment of specific zoning bylaws regulating future residential development of the Project site. The agreement, and associated land transfer, was approved by the Environmental Division and not appealed.

¶ 3.     The parties took actions to effectuate the terms of the agreement. In 2016, through the ordinary process, the City amended its bylaws to create a new Southeast Quadrant Neighborhood Residential North (SEQ-NRN) district. This new district encompassed the Project Parcel. The new SEQ-NRN regulations prescribed specific design and other requirements for any future residential development of the Project Parcel. In addition, after application by landowner, the Project Parcel was created by subdivision and approved in a 2017 Act 250 Permit. The 2017 Permit authorized the subdivision of the land but noted that "[n]o development is proposed or approved." The 2017 permit was not appealed. Following the bylaw amendments and the

___

of its interest in the Project. We refer to the two entities collectively as landowner throughout this decision.

2

subdivision, the City sold the Project Parcel to JAM Golf and removed it from the City-owned Wheeler Nature Park.[3]

¶ 4.     Landowner then submitted a final plat application seeking approval for the housing development to be sited on the Project Parcel.  The City's Development Review Board (DRB) approved the Project in a July 2021 decision which was not appealed.  In July 2022, the District Commission granted landowner's application to amend the previously unappealed 2017 Act 250 permit.  The 2022 amended permit specifically authorized construction of thirty-two residential units and contained conditions regulating the timing of and specifications for blasting and construction of the new subdivision due to concerns around noise, safety, and traffic.

¶ 5.     Neighbors appealed to the Environmental Division raising five questions related to the Act 250 Criteria, including the project's compliance with Criteria 1 (air pollution), 5A (traffic), 8 (visual aesthetics), 8 (noise), and 10 (relevant municipal and regional plans).  The court held six days of trial and conducted a site visit.  In August 2024, the court affirmed the Act 250 permit amendment with the conditions related to noise and safety during the construction period, concluding that the Project complied with all relevant Act 250 criteria.  In addition, responding to neighbors' claims, the court also determined that the application should not be denied on the grounds of inequitable conduct because neighbors failed to support assertions that landowner made material misrepresentations in its application and on appeal.  Neighbors filed this appeal.

II.  Settlement Agreement and Permit Amendment

¶ 6.     Neighbors argue that the 2017 Act 250 permit contained conditions that prohibit development of the Project Parcel and the amended permit allowing development is therefore

---

[3] Several of neighbors' arguments relate to regulations and standards applicable only to the Wheeler Nature Park.  The Project Parcel at issue in this case is no longer part of the Park, having been partitioned from the larger parcel of land in 2017 as part of the approved subdivision. That permit was not appealed.  Therefore, the Wheeler Nature Park standards are not applicable.

invalid.[4]  Neighbors' argument concerning the amendment of the 2017 Act 250 permit is not preserved for appeal because it was not included in the statement of questions presented to the Environmental Division and not raised to that court.  Therefore, we will not address this argument on appeal.

¶ 7.    "The Environmental Division is a court of limited jurisdiction."  In re DJK, LLC WW & WS Permit, 2024 VT 34, ¶ 25, __, Vt. __, 323 A.3d 911; 4 V.S.A. § 34 (identifying Environmental Division's jurisdiction).  The Environmental Division's review here was limited to the Project's compliance with Act 250 criteria as identified by applicant through its statement of questions.  See V.R.E.C.P. 5(f) (limiting legal issues that may be presented at trial to those issues raised in appellant's statement of questions, subject "to a motion to clarify or dismiss some or all of the questions"); see also 10 V.S.A. § 8504(h) (directing that, with respect to de novo hearings, legal issues to be addressed on appeal are limited to "those issues which have been appealed").  An appellant's statement of questions "functions like a pleading to limit the issues that are to be heard on the appeal."  In re Atwood Planned Unit Dev., 2017 VT 16, ¶ 12, 204 Vt. 301, 167 A.3d 312 (quotation omitted).

¶ 8.    Where, as here, an appellant fails to present an issue in its statement of questions to the Environmental Division, that court is without jurisdiction to address the issue and the matter

---

[4] Embedded within this argument is neighbors' allegation that the City's negotiation of the 2015 agreement with JAM Golf was illegal or improper.  The 2015 agreement specified that the City's Land Development Regulations (LDRs) would need to be amended for the "use contemplated" by the agreement—the building of thirty-two housing units on the Project Parcel—to comply with zoning and land use requirements.  The agreement went on to reference the procedure by which any such zoning amendments would be pursued, stating that the "City's legislative body will hold a meeting to consider adoption" of the amendments.  The agreement also provided for the termination of the deal should the City not adopt amendments "suitable for [JAM Golf's] purposes."  The agreement between the City and JAM Golf was approved by the Environmental Division in a Consent Order that was not appealed and is therefore final.  The propriety of the unappealed agreement was not before the Environmental Division in this case and thus is not part of this appeal, although we note there is no evidence of bad faith before us in either the agreement's terms or its compliance.

4

is not preserved for review by this Court. In re Dousevicz, Inc. CU & Site Plan Approval, 2025 VT 22, ¶ 12, __Vt. __, __A.3d __ (explaining Environmental Division's jurisdiction is limited to legal issues raised by applicant through its statement of questions); In re Morrisville Hydroelectric Project Water Quality, 2019 VT 84, ¶ 17, 211 Vt. 233, 224 A.3d 473 ("To preserve an argument for appeal, a party must present an argument with specificity and clarity." (quotation omitted)).

### III. Relevant City Plan

¶ 9.     Because some of neighbors' arguments concern the application of community standards in the municipal plan, we first address which plan should apply. "A town plan is an overall guide for a municipality's development." In re Paynter 2-Lot Subdivision, 2010 VT 28, ¶ 8, 187 Vt. 637, 996 A.2d 219 (mem.). Town plans are prepared, adopted, and amended by the town's planning commission, with public participation, pursuant to statute. See 24 V.S.A. §§ 4384-4385. During the pendency of neighbors' appeal to the Environmental Division, the City adopted the 2024 City of South Burlington Comprehensive Plan to replace a 2016 plan in effect at the time of landowner's application.[5] The 2016 Plan contained land use maps that reflected the use and status of the Project Parcel as part of the Wheeler Nature Park, before it was conveyed to landowner. The 2024 Plan contained updated maps reflecting the existence of the SEQ-NRN development district. Landowner asserted that its development complied with both plans but elected to be reviewed under the 2024 plan. The Environmental Division agreed to apply the 2024 plan. The Environmental Division based its decision on a "long-established principle in Act 250" proceedings that town plan amendments "which occur after the application date and which favor an applicant" are the plans against which an application is assessed if the applicant has so

---

[5]     Neighbors argue that the 2024 South Burlington City Plan was not duly adopted. However, there is no evidence the plan was timely challenged and so it became final. In addition, that issue was not before the Environmental Division as it was outside that court's jurisdiction. We therefore decline to review this claim on appeal.

5

requested.[6] Neighbors argue that the trial court erred in allowing landowner to elect to be assessed against the updated 2024 City Plan, rather than the 2016 City Plan. We conclude there was no error.

¶ 10. The question of which version of the city plan applies is a question of law that we review without deference to the trial court. In re Burton Corp. Conditional Use/Act 250, 2024 VT 40, ¶ 18, __ Vt. __, 325 A.3d 59 ("The Environmental Division's legal conclusions are reviewed de novo."). In general, development rights vest under regulations in effect when an application is filed. In re B & M Realty, LLC, 2016 VT 114, ¶ 22, 203 Vt. 438, 158 A.3d 754. Therefore, once an application is filed, even if a city plan is amended, an applicant retains the right to be evaluated under the plan in effect at the time of application. John A. Russell Corp., 2003 VT 93, ¶ 12. However, this principle does not require applicants to be bound by the plan in effect at the time of application. It would be inefficient and a waste of administrative and judicial resources to prevent an applicant from relying on amendments to a city plan if it chooses because nothing prevents an applicant from "withdraw[ing] an application and resubmit[ting] [it]. . . to take advantage of . . . subsequently enacted regulations." Id. ¶ 13. Allowing an applicant to elect to be bound by a revised plan instead of requiring an applicant to reapply is in harmony with the Environmental Division's procedural rules that seek to "ensure summary and expedited proceedings consistent with a full and fair determination" of matters before the court. V.R.E.C.P. 1.

---

[6] The Environmental Division articulated this principle as an "exception to the vested rights doctrine." The vested-rights doctrine is a constitutional rule that a legislative body "cannot take away a right that has been vested by a social compact or by a court's judgment." Vested-Rights Doctrine, Black's Law Dictionary (12th ed. 2024). An applicant, however, is not bound by a vested right. See In re John A. Russell Corp., 2003 VT 93, ¶¶ 12-13, 176 Vt. 520, 838 A.2d 906 (mem.) (concluding that conformance to town plan under Act 250 must be measured under laws in effect at time of application but noting that applicant could withdraw application and resubmit to take advantage of subsequent regulations).

¶ 11.    Here, over the course of the Project's permitting process, the City of South Burlington updated its City Plan from the 2016 to the 2024 version.  It would be inefficient and unnecessary to decline to allow landowner to use the 2024 City Plan because nothing would prevent landowner from withdrawing and refiling its application so that it would be subject to the updated plan.  The Environmental Division did not err in allowing landowner to choose to be assessed against the 2024 City Plan.

IV.  Act 250 Permit Conditions

¶ 12.    Next, neighbors argue that the Environmental Division erred in concluding that the Project complies with Act 250 Criterion 8 regarding visual aesthetics and noise and with Criterion 10 regarding compliance with a local or regional plan.  We conclude that the evidence supports the court's determination that the Project complies with all relevant Act 250 Criteria, and we therefore reject this argument.

¶ 13.    An applicant must satisfy ten criteria to obtain an Act 250 permit.  10 V.S.A. § 6086(a).  The applicant bears the burden of establishing Criteria 1 through 4, 9, and 10, and parties opposing the application bear the burden of demonstrating unreasonable or adverse effect under Criteria 5 through 8.  Id. § 6088.  A permit may contain requirements or conditions that ensure these criteria are met.  Id. § 6086(c).

¶ 14.    "We review the Environmental Division's factual findings with deference and will not overturn them unless taking them in the light most favorable to the prevailing party, they are clearly erroneous, meaning that there is no credible evidence to support them."  Burton Corp., 2024 VT 40, ¶ 18 (quotation omitted).  We will uphold the court's legal conclusions "if they are reasonably supported by the findings."  In re Katzenbach A250 Permit #7R1374-1, 2022 VT 42, ¶ 11, 217 Vt. 155, 287 A.3d 36 (quotation omitted).

7

## A. Criterion 8

¶ 15.  Neighbors claim that the Environmental Division erred in concluding that the Project complies with Criterion 8 regarding aesthetics, including visual aesthetics and noise.  The court determined that the Project did not violate community standards, was not shocking to the average person, and integrated reasonable mitigation efforts.  Neighbors argue on appeal that the court's finding that the adverse effect is not undue is "bereft of any supporting facts."  The record indicates otherwise.

¶ 16.  Under Criterion 8, a proposed project may "not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites, or rare and irreplaceable natural areas."  10 V.S.A. § 6086(a)(8).  When assessing a project under Criterion 8, a court follows the two-part "Quechee test."  See In re Rinkers, Inc., 2011 VT 78, ¶ 9, 190 Vt. 567, 27 A.3d 334 (mem.) (approving use of Quechee test).  This two-prong test asks first if a proposed project will have an adverse aesthetic impact, and second if the impact will be "undue."  In re Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 74, 199 Vt. 19, 121 A.3d 630.  An impact is "undue" if:

> (1) it violates a clear, written community standard intended to preserve aesthetics or scenic, natural beauty of the area; (2) it offends the sensibilities of the average person; or (3) the applicant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

Id. (alterations and quotations omitted).

### i. Visual Impact

¶ 17.  The Environmental Division found that the Project would have an adverse visual impact because it would partially obstruct existing views of the Green Mountains available from the adjacent recreational path and Dorset Street.  The court determined, however, that the adverse impact was not undue because (1) the Project did not violate any clear, written community standard with respect to aesthetics; (2) significant residential development was already a "defining

8

characteristic" of the area, thus the Project's impact on views from the recreational path and Dorset Street would not be shocking to the average person; and (3) neighbors "failed to identify any reasonable mitigation" that landowner was not already undertaking. Neighbors challenge the court's determination of all three undue-adverse-impact factors. We determine that the evidence reasonably supports the Environmental Division's determination that the Project complies with Criterion 8 with respect to visual impact.

¶ 18. First, neighbors argue that the Project violates standards included in the 2018 Chittenden County ECOS Plan, a 2014 Open Space report, and the 2004 Arrowwood Ecological Assessment. In assessing community standards, we have looked to whether the language is "clear and unqualified, and creates no ambiguity." See John A. Russell Corp., 2003 VT 93, ¶ 16 (quotation omitted). The Environmental Division determined that none of these documents set forth applicable standards for purposes of assessing the Project's compliance with clear, written community standards under Criterion 8. See In re Eastview at Middlebury, Inc., 2009 VT 98, ¶ 21, 187 Vt. 208, 992 A.2d (explaining that written standards with which proposed development must comply provide clear, written community standards for Criterion 8 review); In re Woodstock Cmty. Tr. & Hous. Vt. PRD, 2012 VT 87, ¶ 33, 192 Vt. 474, 60 A.3d 686 (explaining that language in town plan supporting various and conflicting policy choices without attempting to resolve conflict did not set "clear" community standards), holding modified by Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 59. The court found that the 2018 ECOS Plan by its own terms was not a clear standard as it specifically stated that it was a "strategic plan that is intended to provide general advisory guidance." Further, in making the Plan, the Regional Planning Commission "intentionally chose to use 'should,' rather than shall, in the Plan's goal statements." Similarly, the court found that the 2014 Open Space Report did not create standards as it was developed to "document and recommend strategies" that the City could "consider[]" when making decisions about "the city's most valuable and important spaces." Finally, the court found that the Arrowwood Ecological

9

Assessment plainly states that its objective is to "make management recommendations." Without mandatory language, the court determined that none of these documents provided clear standards that were applicable to the court's assessment of the Project's compliance with Criterion 8. Additionally, the court found that none of the documents were incorporated into the 2024 City Plan, and thus would not be assessed as such. The evidence supports the court's findings that these documents do not provide clear, written community standards with respect to aesthetics.

¶ 19. Next, neighbors contend that the adverse impact is undue because the Project would be shocking to the average person. They argue that the Project would diminish views along a recreational path and would interfere with the use of Wheeler Nature Park. They rely on testimony that centered on the desire by neighbors and others that utilize the recreational path and Nature Park for the Project Parcel to remain an open lot.

¶ 20. In assessing this factor, the Environmental Division noted that the inquiry under this prong concerns the sensibilities of the average person, rather than the particular sensibilities of neighbors. While acknowledging the Project's impact on existing views, the court identified that there is "significant residential development" in the area surrounding the Project Parcel. Given this context, the court found that the impact of the Project "is consistent with the uses in the area, and therefore consistent with the character" and scenic qualities of the area. Additionally, a landscaping plan included with the permit amendment application "proposes to retain existing trees and provide plantings throughout the Project, including buffers" along the recreation path and a split rail fence surrounding portions of the Property.

¶ 21. The evidence supports the court's determination that the Project's adverse impact would not be shocking to the average person. The Environmental Division, in making its determination, "need not poll the populace or require vociferous local opposition in order to conclude that an average person would consider the project to be offensive." In re McShinsky, 153 Vt. 586, 592, 572 A.2d 916, 920 (1990). The court considered the evidence provided by

10

neighbors, but found other factors more persuasive, including the existing development in the area. We do not reweigh the evidence on appeal. In re N. E. Materials Grp., LLC/Rock of Ages Corp. Act 250 Permit, 2019 VT 55, ¶ 6, 210 Vt. 525, 217 A.3d 541 ("The environmental court determines the credibility of witnesses and weighs the persuasive effect of evidence." (alteration and quotation omitted)).

¶ 22.    Finally, neighbors assert that no mitigation is possible and that the Project should be built elsewhere. The court assessed both the landowner's proposed mitigation strategies as well as neighbors' assertions. The court found that landowner's landscaping plan, included as part of the Act 250 permit amendment application, "proposes reasonable visual mitigation of the Project." In addressing neighbors' proffered "mitigation," the court explained that relocation of a project to an off-parcel location was "not reasonable mitigation under Criterion 8." See In re Stokes Commc'ns Corp., 164 Vt. 30, 39, 664 A.2d 712, 717-18 (1995) (explaining that "a generally available mitigating step is one that is reasonably feasible and does not frustrate the project's purpose or Act 250's goals"). The court acted within its discretion in finding that landowner's applicant's mitigating steps improved the harmony of the Project with the surroundings as necessary.

ii. Noise Impact

¶ 23.    Noise impacts are also assessed under Criterion 8 following the same two-prong Quechee test. Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 74. Here, the Environmental Division found that temporary construction noise from the Project would have an adverse impact because off-site noise impacts from drilling and blasting would disturb neighbors. The court determined, however, that the impact was not undue because (1) the Project did not violate any clear, written community standard with respect to noise; (2) noise impacts would be limited to a three-month construction period and mitigated through reasonable construction hours and other practices including blasting time limitations and safety stops; and (3) neighbors failed to identify reasonable noise mitigation

11

that landowner was not already undertaking. On appeal, neighbors challenge the court's determination of all three factors. As explained more fully below, the evidence reasonably supports the Environmental Division's determination that the Project complies with Criterion 8 with respect to noise.

¶ 24. First, neighbors contend that the City of South Burlington Nuisance Ordinance and Land Development Regulations provide clear, written community standards for noise. The Environmental Division found that permits issued for the Project by the City specifically authorized the blasting and drilling at issue in neighbors' appeal, and therefore the Project did not violate either the ordinance or regulations.

¶ 25. While we accord no deference to the Environmental Division's interpretations of local zoning ordinances, In re Confluence Behav. Health, LLC, 2017 VT 112, ¶ 12, 206 Vt. 302, 180 A.3d 867, we continue to defer to "a municipality's interpretation of its own ordinance if it is reasonable and has been applied consistently," Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 21.

¶ 26. The City Nuisance Ordinance states "[i]t shall be unlawful for any person to make or cause to be made any loud or unreasonable noise." S. Burlington Code of Ordinances § 14-51. The ordinance exempts noises from several categories of specific sources. One exempted source of noise is "[e]vents and activities conducted by or permitted by the city." Id. § 14-53(5). Neighbors argue that this exemption does not apply to the Project because the ordinance goes on to state that events or activities conducted pursuant to "an entertainment permit, parade/street event permit, or parks special use permit" must abide by the terms and conditions of pertinent "permits or licenses." Id. The court found that the ordinance exemption applies to the Project because landowner received a municipal zoning permit specifically authorizing the blasting and drilling challenged by neighbors.

¶ 27. We agree with the Environmental Division that the ordinance exemption is not limited to the types of permits specifically listed in the ordinance clause. To conclude otherwise

12

would mean that other actions permitted by the City, particularly construction activities, would be nuisances. This would not be rational. See In re Stowe Club Highlands, 164 Vt. 272, 280-81, 668 A.2d 1271, 1277 (1995) (declining to interpret ordinance in way that leads to irrational results). Our interpretation is further supported by the ordinance's express prohibition of "[n]oise resulting from . . . excavation, demolition, erection, construction, alteration or repair of any premises or structure" between specified overnight hours. S. Burlington Code of Ordinances § 14-52(5). The express prohibition during certain hours contemplates that such activities would not create a "noise disturbance" at other times. We therefore conclude that the exemption applies, and the Project does not violate the ordinance.

¶ 28. Next, neighbors contend that performance standards set forth in Section 3.13 of the Land Development Regulations (LDR) provide clear, written community standards for noise. Section 3.13(B) states that "the use of land in any manner so as to cause hazardous or objectionable conditions to exist or to in any way endanger users of the site or the surrounding area" is prohibited. S. Burlington Land Development Regulations § 3.13(B).[7] The regulations list noise and vibration as potentially objectionable conditions. Id. Appendix A to the regulations provides further detail concerning performance standards. Section A.3 states "[a]ny noise which is deemed objectionable because of volume, frequency or beat and is not muffled or otherwise controlled" is declared to be "loud, disturbing and unnecessary" and a violation of the regulations. Id. Appendix A § A.3(a) (emphasis added).

¶ 29. Here, the South Burlington Department of Planning and Zoning granted landowner a zoning permit for the Project, concluding that § 3.13 of the Land Development Regulations was inapplicable. However, in the permit, the City used § 3.13 performance standards to "guide its

---

[7] The City of South Burlington adopted amendments to the Land Development Regulations in November 2024. The relevant section is now codified under § 3.16. We refer to the relevant section as it existed at the time of the Project's application for the purposes of this case.

discussion" of permit conditions that would ensure sufficient mitigation of the impacts related to the drilling and blasting. That permit was not appealed. The Environmental Division found that, even if applicable, the Project conformed with the performance standards in the LDRs because noise during the construction phase was controlled and mitigated by permit conditions issued by the City as well as the Act 250 permit conditions. The court thus determined that the Project did not violate either standard regarding noise. The court findings are supported by the evidence and neighbors have not provided any basis to disturb them.

¶ 30. The court then assessed whether the noise impacts of the Project would be shocking to the average person. Neighbors do not contend that the housing units will have undue adverse noise impacts once constructed but argue noise impacts during the temporary construction phase of the Project, including drilling and blasting, would be "shocking and offensive."

¶ 31. Neighbors testified to various ways in which construction noise would impact them and the surrounding area. The court acknowledged that drilling and blasting associated with the Project would have an adverse impact on the surrounding neighborhood. However, the court distinguished temporary construction noise from noise that is a "fundamental aspect of [a] project throughout its lifetime." In this instance, "after its completion, the Project will be a residential neighborhood with limited noise impacts." Additionally, the court found numerous ways in which the noise impacts were affirmatively addressed by conditions in the permit, thereby minimizing the impact on the surrounding area. The Project will employ an experienced drilling and blasting contractor. A Blasting Plan and a Blast Traffic Plan will manage how the activities are conducted. Landowner will notify neighbors several weeks prior to the first blasting event, as well as conduct pre- and post-blast surveys on structures within 750 feet of the blasting. Landowner will monitor noise and seismic impacts and prepare monitoring reports for each blast. Construction hours, including drilling and blasting activities, will be limited each day. Additionally, "blasting may only occur during a three-month period." The evidence supports the court's finding that these

14

restrictions and conditions ensure that noise impacts from the Project will be limited and not unduly shocking or offensive.

¶ 32. Finally, the court assessed the various mitigation strategies proposed by landowner as well as neighbors' proffered mitigation. As referenced above, the Project design includes numerous restrictions and conditions designed to mitigate noise impacts during the temporary construction phase. Neighbors presented strategies such as reducing the number of units, eliminating "all blasting and drilling," and other design changes that the court found essentially "amount[] to a considerable redesign of the current Project." Because neighbors "point[ed] to no reasonable noise mitigation" that landowner had not already integrated into the Project's design, the court did not err by concluding that the Project complied with this prong of the Quechee test.

¶ 33. For the aforementioned reasons, the Environmental Division's conclusion that the Project complies with Criterion 8 is reasonably supported by its factual findings.

B. Criterion 10

¶ 34. Neighbors make several claims related to the South Burlington City Plan and the Project's conformance with the Plan under Act 250, Criterion 10. Neighbors argue the trial court erred in determining that both the 2024 City Plan and the 2018 ECOS Plan do not present mandatory language that it must apply under Criterion 10.

¶ 35. Act 250 Criterion 10 requires that developments be "in conformance with a duly adopted local or regional plan." 10 V.S.A. § 6086(a)(10). To be binding on an applicant, the language of a town or regional plan must be mandatory, not merely aspirational. In re B & M Realty, LLC, 2016 VT 114, ¶ 35. Only language that sets forth a specific policy in clear and unqualified terms will create a mandatory standard enforceable through Criterion 10. John A. Russell Corp., 2003 VT 93, ¶ 16; see also In re Kisiel, 172 Vt. 124, 130, 772 A.2d 135, 140 (2000) ("Absent some objective measure to guide enforcement . . . there was no basis for the [Environmental] Board to conclude that the project was not in compliance."); cf. In re Green Peak

Ests., 154 Vt. 363, 369, 577 A.2d 676, 679 (1990) (affirming Environmental Board's enforcing of "specific policy" in regional plan). In contrast, an applicant does not have to conform to "broad policy statements phrased as nonregulatory abstractions." John A. Russell Corp., 2003 VT 93, ¶ 16 (quotation omitted).

¶ 36. As discussed above, we agree with the Environmental Division that the 2024 City Plan and the 2018 ECOS Plan include only aspirational language, rather than mandatory standards. Therefore, neighbors have not provided any clear standards applicable to Criterion 10.

## V. Landowner's Conduct

¶ 37. Finally, neighbors reiterate previous assertions that landowner's permit amendment should be denied for "ongoing inequitable conduct" related to the 2015 agreement between landowner and the City and assertions made by landowner in its Act 250 permit application. Neighbors repeat their claim that the 2015 agreement between landowner and the City was improper. Additionally, neighbors contend that landowner misrepresented its interest in the Property in its application and on appeal, made misstatements concerning zoning districts applicable to the Project, and did not provide accurate answers to permit questions pertaining to impacts from blasting. The court acknowledged that this issue was not explicitly raised in neighbors' statement of questions but addressed the assertions to the extent that they were "implicitly or intrinsically raised." See Dousevicz, 2025 VT 22, ¶ 13 ("[T]he court can consider matters intrinsic to a statement of questions even if the issue was not literally stated in the statement of questions." (quotations omitted)). As discussed above, the propriety of the City's 2015 agreement with landowner was not before the Environmental Division, and we therefore do not address it here. As to landowner's alleged misrepresentations, the Environmental Division determined that the "application should not be denied" on neighbors' asserted grounds because neighbors failed to support their claims that landowner made material misrepresentations in its application and on appeal. We agree.

¶ 38. Resolution of neighbors' claims depended solely on factual determinations concerning statements made by landowner on permit applications and before the trial court. "We review the Environmental Division's factual findings with deference and will not overturn them unless taking them in the light most favorable to the prevailing party, they are clearly erroneous, meaning that there is no credible evidence to support them." Burton Corp., 2024 VT 40, ¶ 18 (quotation omitted). The Environmental Division explained that it reviews Act 250 appeals de novo and found that landowner "at no time . . . materially misrepresented its interest in the Property." The court went on to note that "misstatements and subsequent revision[s] and correction[s]" in permit applications "do not give rise [to] some form of disqualification." Regarding neighbors' remaining claims of misrepresentation in landowner's Act 250 permit application, the court found that landowner adequately responded to questions concerning possible impacts from blasting and did not need to provide a noise analysis because "[n]oise is not an ongoing factor in the Project," construction will occur on set days and times, and blasting noise is limited to a three-month period. These findings are supported by the record, and they support the court's denial of neighbors' claims of inequitable conduct.

Affirmed.

FOR THE COURT:

_____
Chief Justice

17