STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| In re: Hartland Group, 237 North Ave. Project | } | Docket No. 120-6-05 Vtec |
| (Appeal of Bjerke, <u>et al.</u>) | } | |
| | } | |

Decision and Order on Cross-Motions for Summary Judgment

Appellants Alan Bjerke, Valerie Hockert-Lotz, Edward Winant, Annelein Beukenkamp-Winant, James Bumpas and Molly Bumpas, appealed from the decision of the Development Review Board (DRB) of the City of Burlington, granting Appellee-Applicant Hartland Group, LLC's application for approval of a building housing twenty-five condominiums and a restaurant-café at 237 North Avenue. Appellants are represented by Appellant Alan A. Bjerke, Esq.; Appellee-Applicant is represented by Ronald A. Shems, Esq.; and the City is represented by Kimberlee J. Sturtevant, Esq.

The parties have moved for partial summary judgment on Questions 2, 3, 4, 8, 9 and 10 of Appellants' Revised Statement of Questions. A related application for Act 250 approval of this project was granted; the Act 250 land use permit was not appealed. The parties have also filed memoranda addressing the preclusive effect of the final Act 250 permit on the issues in this municipal appeal. The following facts are undisputed unless otherwise noted.

Appellee-Applicant proposes to redevelop an existing .65-acre parcel[1] of property,

---

[1] The parcel as a whole encompasses an additional 0.05 acre strip of land on the westerly end of the original parcel (at the top of the cliff), purchased from the City in September 2004. However, a condition of the deed states that the additional parcel "will not be used to calculate allowable density, setbacks or lot coverage to meet zoning

1

currently improved with an existing 16,500 square-foot commercial building, at 237 North Avenue. Appellee-Applicant proposes a twenty-five-unit condominium complex and a forty-seat restaurant-café. Appellee-Applicant's parcel is located at the intersection of North Avenue and Berry Street in a Residential Medium-Density zoning district in the City's "Old North End" neighborhood.

The lot at 237 North Avenue is roughly rectangular, with the shorter dimension of approximately[2] ninety-two feet fronting[3] on the west side of North Avenue. The next street intersecting with the west side of North Avenue to the north of Berry Street is Sunset Court. The northerly lot line of the project parcel is bordered by three residential lots having frontage on Sunset Court.

The southerly lot line of the project parcel is approximately 314 feet in length. It runs for approximately 246 feet along the northerly side of Berry Street to the westerly side of the intersection of Berry Street with Lakeview Terrace, where it makes an approximate two-foot jog to the north, and continues towards the west for approximately sixty-eight feet along the northerly side lot line of Appellants Hockert-Lotz and Bjerke's property. The parcel's westerly lot line runs at an angle along the top of the cliff above the adjacent city-

---

requirements for the development" of the original 0.65-acre lot. Accordingly, the calculations set forth in this decision are based upon the 0.65-acre lot rather than the full 0.7-acre lot.

[2] All distances are approximate by scale measurement from the reduced-size plans filed as exhibits to Appellee-Applicant's motion, and are used for descriptive rather than for quantitative purposes.

[3] The lot's orientation to the other surrounding streets and adjacent parcels has raised an issue, posed by Question 3 of the Statement of Questions, as to whether each of the property's other lot lines should be treated as a front, a side or a rear lot line, for the purposes of determining which setback requirements are applicable to the new portions of the project. See discussion of Question 3, at pp. 13–16, below.

owned property to connect with the northerly lot line.

As shown on the lot coverage calculations submitted by Appellee-Applicant on sheet L1 of the proposed plans, the existing building and its associated paved and gravel parking lot cover approximately 89% of the .65-acre parcel. As shown on sheet E-1 of the proposed plans, the existing building itself is approximately 91' in width, set back at a slant approximately sixteen to twenty feet from the easterly lot line (the property's frontage on North Avenue). The existing single-story building extends westerly at a shallow angle to the lot line, approximately 146 feet along Berry Street to the entrance to the parking lot, very close to the southerly lot line. The existing building is located very close to the northerly lot line as well. The remaining segment of the existing building extends approximately a further sixty feet westerly, but only occupies approximately the northern half of the western side of the property. Some of the parking area to the west of the existing building is paved, while the remainder is surfaced with gravel; the parking area occupies most of the remaining lot area not covered by the existing building structure. A chain link fence surrounds the southerly and westerly sides of the parking lot, access to which is controlled by a gate.

The property of Appellants Bjerke and Hockert-Lutz is adjacent to the southerly lot line of the project property as that line extends westerly from the corner of Berry Street and Lakeview Terrace. The northerly side of their house nearly abuts their northerly lot line. The other Appellants own property on Sunset Court. The property of Appellants Winant and Beukenkamp-Winant is located at the westerly end of Sunset Court, adjacent to the northerly lot line of the project property. Their existing detached garage abuts the northerly lot line of the project property. The property of Appellants Bumpas is located easterly of the Winant property on Sunset Court, also adjacent to the northerly lot line of the project property. Their existing attached garage also nearly abuts the northerly lot line of the project property.

3

The original building on the property, a 2,600 square-foot two-story portion of the existing building nearest the northeast corner of the project property, was constructed in 1923. By 1928, the building had been expanded for use as an automobile dealership, extending across the entire North Avenue frontage and towards the west along Berry Street, with room for some parking along North Avenue in front of the building. The building was in use as an automobile showroom and repair facility. The original auto showroom contained a stepped, parapeted gable roof, which remains intact, as does the remainder of the original service garage on the North Avenue side of the property. The original auto showroom had two large windows facing North Avenue on the ground floor showroom level, and a third window centrally located on the second floor above the door, all of which remain in place at the present time. Some of the other windows facing North Avenue and Berry Street have been bricked in, but windows along Berry Street near the intersection with Lakeview Terrace, and near the intersection with North Avenue have been left in place. The third addition to the building extended the building westerly and added a loading dock on the westerly end of the building, and installed a parking lot with access near the intersection of Berry Street and Lakeview Terrace.

The automobile dealership operated at the property through the adoption of zoning in Burlington in 1971. In 1979, the property obtained zoning approval to establish a printing plant in the building, which also may have continued to house[4] a tire retail use. Some of the large display windows were bricked in at approximately this time. Between 1979 and 1986, zoning approvals were issued to change the tire retail use to a piano retail use, to authorize the operation of a professional audio retail and repair business use in the

---

[4]   It is difficult to determine which of the uses operated in the building simultaneously or successively, as the parties have only provided the 1991 and 1995 permits and the decision on appeal. However, the permit history prior to 1987 does not appear to be material to any issues in the present appeal.

4

building, and to convert the printing company use to a screen printing and graphic supply business use.

In 1987, an importing and wholesale business known as Cornell Trading, Inc., dealing in clothing and household furnishings, bought the building and was granted zoning approval to operate its business in a portion of the building, including its administrative office and its distribution warehouse functions. At that time, Cornell Trading, Inc., applied for approval to use approximately 50% of the building for its business. In 1990, zoning approval was issued for an antiques cooperative use in the space formerly used for the screen printing and graphics business, to install landscaping and fencing, and to remove the front yard parking.

In 1991, the importing and wholesale business obtained what the DRB referred to as "conditional use approval for the conversion of an existing commercial use to another," to expand the importing and wholesale business use to utilize the entire building, setting certain hours of operation, a limit of sixteen on-site employees, and other limitations. In 1995, the business obtained what the DRB referred to as "conditional use for modifications to the existing business operation," addressing the hours of operation, the locking of the Berry Street gate, increasing the number of employees to a maximum of forty, screening of the neighboring property, and the use of the Berry Street loading door.

The existing importing and wholesale use of the building ceased[5] on June 23, 2004.

In the present application, Appellee-Applicant proposes to expand the building's footprint towards the west, and to convert the property's use to a mixed-use building containing twenty-five residential condominiums and an associated garage, and a forty-

---

[5] The §20.1.6(d) deadline for the resumption of the nonconforming use was the subject of an extension issued by the Zoning Administrator on June 17, 2005, to expire on June 22, 2006. See analysis at Question 8, pages 20-22 below.

seat restaurant-café. The resulting building is designed to have a ground[6] floor that fills the footprint of the building, with three separate three-story segments each having two stories above the ground floor, so that the building has the appearance and mass of three smaller buildings above the ground floor.

The ground floor is designed to have a 12,500-square-foot parking garage in the central portion of the building, including room for household storage units assigned to the residential units, for bicycle racks, and for the garbage storage for the building. An elevator for the central portion of the building is accessible from the garage or from a pedestrian entrance from Berry Street. Vehicular access to the garage is from Berry Street, but much closer to North Avenue than is the current access to the parking lot for the existing building. The ground floor of the project is designed to have a 2,247- square-foot, forty-seat restaurant-café on the North Avenue (easterly) end of the building, in the oldest portion of the original building. The restaurant-cafe's design incorporates the original floor slab and exterior walls of the automobile dealership showroom, with the interior space designed to resemble the style of the showroom. All the large front display windows of the former showroom are proposed to be restored as windows, removing the brick fill installed in the late 1970s during the conversion of the building's use to a printing plant. On the ground floor of the westerly end of the proposed building, three single-story condominium units are proposed, with ground floor patios facing west towards Lake Champlain.

Above the ground floor, the project is designed to have the appearance of three

---

[6] The plans and memoranda submitted by Appellee-Applicant use the terms "ground floor" and "first floor" to refer to the lowest floor of the proposed building; this decision only uses the term "ground" floor, to avoid confusion. No basement space is proposed although a stormwater retention tank is proposed to be installed below the ground floor of the garage portion of the building.

separate building segments  containing the twenty-two remaining condominium units. The eastern building segment, above the restaurant-café, will contain four two-bedroom condominium units on the second floor and three two-bedroom units on the third floor. The middle building segment, above the garage, will contain eight two-bedroom condominium units, four on the second floor and four on the third floor.  The western building segment will contain six two-bedroom condominium units over the three ground floor units: three on the second floor and three on the third floor, as well as a two-story, two-bedroom condominium unit on the second and third floors over the westerly end of the garage.  A second Berry Street entrance near the intersection of Berry Street with Lakeview Terrace provides access for the western residential units, and a second elevator provides access to the units on the upper floors.  The extent to which any of the units are proposed to have access to roof-top patios does not relate to the issues on summary judgment, but may be an issue for trial.

Appellee-Applicant proposes to restore the front part of the building, facing North Street, to the appearance of the original automobile showroom facade, to be converted to use for the restaurant-café.  The easterly wall of the building will remain in place and be restored to resemble its original appearance with the addition of windows and doors, as will the northerly wall from the northeast corner to the westerly end of the original automobile showroom building, and the southerly wall from the southeast corner to the entrance to the new garage.

Appellee-Applicant proposes to retain the masonry elements of the original automobile showroom building, and the Vermont redstone exterior base of the existing building.  The existing concrete slab floor will be preserved in the space to be converted to the restaurant-café.  Below the proposed garage, the existing floor will be excavated to install a stormwater retention tank, and then restored in its original location.  Portions of the southerly wall of the existing building lack an adequate foundation; that wall will be

reconstructed in its present location and appearance, except to install the garage entrance and to install ventilation openings to provide air circulation in the proposed parking garage in place of some of the original windows. Three sections of the southerly wall, totaling approximately twenty-five linear feet, will be lowered in height from that of the existing building by approximately three-and-a-half feet to accommodate the new construction. The westerly walls and the roof of the existing building will be removed to accommodate the new residential construction proposed to extend westerly of the end of the existing building, and above the roof of the existing building.

As proposed, the lot coverage of the existing building plus paved and unpaved parking areas and walkways on the property is approximately 25,228 square feet, which is proposed to be reduced to 22,329 square feet. The portion of the lot coverage represented by the footprint of the building itself is proposed to increase from 15,394 square feet to 21,117 square feet.

The setbacks of the existing building as to the lot line facing North Avenue are less than the 25' setback required as a front yard setback for a commercial structure or the 20' required for a residential structure on a "Collector Street" in the RM district (Tables 5-D and 5-E). The setbacks of the existing building as to the lot line facing Berry Street are less than the 25' setback required as a front yard setback for a commercial structure or the 15' required for a residential structure on a "Local Street" in the RM district (Tables 5-D and 5-E). The setback of the existing building measured to the northerly lot line is at most a foot or two, less than the setback required as to a side lot line in the RM district. §5.3.5.

The existing building is non-conforming as to the setbacks along Berry Street and North Avenue, and as to the northerly side lot line. As proposed, the northerly wall, to the west of the westerly end of the original automobile showroom, will be rebuilt because its wooden frame has deteriorated so that its materials cannot be reused. Along the ground floor, the northerly wall is proposed to be rebuilt in its existing location in the area of the

8

storage units in the garage, but otherwise will be pulled back from the northerly lot line to make it more conforming with the side setback requirements. The upper stories of the middle and westerly building segments and the third floor of the easterly building segment, are proposed to be constructed at a distance from the northerly lot line so as to meet the side setback requirements. The southerly wall of the new construction is proposed to be set back from the lot line approximately 15 feet.

Question 2 of Appellants' Statement of Questions: Adaptive Reuse and Residential Conversion

The density allowed for the project depends on whether it qualifies for consideration under §5.2.6(b) of the Zoning Ordinance. Unless otherwise provided, density in the Residential Medium Density zoning district is limited to twenty[7] dwelling units[8] per acre. §3.1.4(b) and Table 5-B. Section 5.2.6 provides exceptions to the maximum allowable density that may be approved by the DRB, and hence this Court, to encourage what is entitled 'elderly housing' (§5.2.6(a)) and 'adaptive reuse' (§5.2.6(b)) in the City's residential zoning districts.

---

[7] Under the inclusionary zoning (affordable housing) provisions of the Zoning Ordinance, a qualifying project in this zoning district may be entitled to a 20% density bonus, making the maximum density 24 dwelling units per acre. §14.1.14. However, it appears that Appellee-Applicant is relying on §5.2.6(b)(2) instead for the density of this project.

[8] Section 5.2.4 provides that, for the purposes of density calculations, each 1,500 square feet of nonresidential gross floor area not contained within the dwelling units or the hallways, stairwells and elevators serving the dwelling units is to be counted as a dwelling unit. Under §5.2.3 fractions below 5/10 are rounded down. The parties have not addressed whether the restaurant-café should be counted or has been counted for density purposes as a dwelling unit. Please be prepared to discuss this issue at the telephone conference scheduled in the final paragraph of this decision.

9

Section 5.2.6(b) contains different adaptive reuse provisions applicable to the different residential districts. Section 5.2.6(b)(1), applicable to the low density residential districts, allows an increased density for "residential development" involving the "adaptive reuse or residential conversion" of existing nonresidential structures, including but not limited to commercial structures and carriage barns, but not for any new construction. Sections 5.2.6(b)(3) and (4), applicable to the high density residential districts, allow an increased density for "residential development" involving the rehabilitation of existing nonresidential structures "to a residential use," and, in a limited area of the residential high density district, allow an even higher density for the redevelopment of an existing nonresidential property for residential use, specifically allowing new structures and certain specified nonresidential uses on the ground floors of the new structures.

In the residential medium density districts, §5.2.6(b)(2) allows an increased density of forty units per acre for "residential development" involving the "adaptive reuse or residential conversion of existing nonresidential structures" and allowing "any new construction on the same lot ancillary to the rehabilitation of such nonresidential structures," provided that the lot coverage does not exceed 80%. The parties do not dispute that the proposed lot coverage of the project does not exceed 80%. Accordingly, if it satisfies the other requirements in §5.2.6(b)(2), the project would be eligible for a density of twenty-six units based on the 0.65-acre lot size. (Twenty-eight units would have been allowed based on a 0.7-acre lot size, but see footnote 1 above.)

Appellants make three arguments that the project does not qualify for the density allowed by §5.2.6(b)(2). First, despite the proposed project's twenty-five residential units, they argue that the existence of the restaurant-café in the same building prevents the proposal from being considered as a "residential" development or "residential conversion," that is, that §5.2.6(b)(2) does not allow only a portion of an existing nonresidential building to be converted to residential use, leaving a portion to continue as a preexisting,

10

nonconforming use.  Second, Appellants argue that the proposal should not be considered to be "reuse," due to the large proportion of the old building's elements proposed to be replaced, rebuilt or removed.  Finally, Appellants argue that the proportion of proposed new construction is too large to be considered as "ancillary" to the rehabilitation of the existing structure.

Adaptive reuse is a term that is not defined in the Zoning Ordinance.  If it were used ambiguously in the Ordinance, the Court could take evidence from experts in the field of historic preservation as to the meaning of the phrase as a term of art in the field of historic preservation, and could take evidence to determine whether the phrase had been consistently interpreted and applied by the zoning and planning staff or the DRB in the past.  Interpretation of the bylaws by the zoning board and the zoning staff can be determinative in a close case, depending on the rationale for the decision and whether the interpretation has been consistent.  In re Maple Tree Place, 156 Vt. 494, 500 (1991); In re Appeal of Korbet, 2005 VT 7, ¶10; 178 Vt. 459, 462 (2005), but see In re Kisiel, 172 Vt. 124, 135–36, n. 6 (2000).

However, the term "adaptive reuse" is not used ambiguously in §5.2.6(b), especially when viewed in the context of the municipal plan.  Zoning ordinances are adopted to carry out the provisions of the municipal plan, which are not otherwise directly enforceable.  Kalakowski v. John A. Russell, 137 Vt. 219, 225–26 (1979).  Because a fundamental function of the zoning ordinance is to carry out the municipal plan, municipal plan provisions do provide the context for the administration or interpretation of the zoning ordinance. See, e.g., Appeal of Baribault, et al., Docket No. 165-9-98 Vtec (Vt. Envtl. Ct., May 30, 2000), slip op. at 8;  Appeals of Perrine, et al., Docket No. 221-12-03 Vtec (Vt. Envtl. Ct., Nov. 30, 2004), slip op. at 6.

From the use of this phrase in the historic preservation section of the 2001 Burlington Municipal Development Plan (the Plan), it is apparent that the phrase "adaptive reuse"

11

refers to the conversion of existing buildings so that they may be used for purposes other than those for which they were originally built. The vision statement of the Historic Preservation section of the Plan notes that the Plan envisions Burlington as a city that "has preserved its historic legacy through careful planning and quality design by encouraging adaptive re-use and respectful infill development." Plan at IV-1. That is, the Plan encourage reuse of the City's existing buildings, together with development of scattered vacant properties, that respects the character of the surrounding existing buildings. The Plan also cites "restoration, adaptive reuse, and renovation" of buildings as an effective economic development strategy, referring to examples of non-residential as well as residential adaptive reuse of historic buildings. Plan at IV-6.

With respect to the housing needs of the City, the Plan also encourages new residential use of existing buildings. In the Housing Action Plan section of the Plan, one of the action items is to "[e]ncourage the appropriate reuse of buildings for mixed-use including residential," while another is to assess "underdeveloped" properties located in residential zoning districts for "suitability of housing development." Plan at IX-12.

Although the concept of adaptive reuse in the Plan covers the renovation and reuse of existing buildings for nonresidential as well as residential purposes, in the present appeal this Court need only consider the use of the term in §5.2.6(b)(2). Section 5.2.6(b) of the Zoning Ordinance only addresses adaptive reuse and renovation of buildings in the context of encouraging more residential development in the City's residential zoning districts by providing greater density. Nothing in the structure of §5.2.6(b) as a whole, or in §5.2.6(b)(2) specifically, precludes an owner from continuing an existing nonconforming use in a portion of an existing building, while converting the remainder of the building to a conforming residential use.

In the project proposed in the present application, neither the fact that much of the northerly wall of the old building has deteriorated and must be rebuilt, nor the fact that the

roof and the westerly wall must be removed to attach or incorporate the new construction, takes the proposed project out of the ambit of §5.2.6(b)(2). It would be an absurd result for §5.2.6(b)(2) on the one hand to encourage the rehabilitation of existing buildings, the conversion of those buildings to conforming residential use, and the addition of new construction for that purpose, and yet to prevent the removal of the building elements necessary to make the rehabilitation safe for future use, or make the new construction possible at all.

Similarly, as long as the new construction falls within the increased density allowed by §5.2.6(b)(2), and because the new construction is all for the residential portion of the project, the proposed new construction is not too extensive to be considered to be ancillary to the rehabilitation of the existing structure for residential conversion. Unlike the term "accessory," which is defined as and carries a connotation of 'incidental' or 'subordinate' to the principal use or structure to which it is being compared, the requirement that the new construction be "ancillary" only requires that it be related to or supportive of the rehabilitation of the existing structure. If it had to be subordinate to or smaller than the existing structure, it would have made surplusage of the former 175% limitation (and the amendment removing that limitation), which would be a disfavored construction of the ordinance. Judicial Watch, Inc. v. State, 2005 VT 108, ¶14; In re Dunnett, 172 Vt. 196, 199 (2001) ("[w]e will not construe [a statute] in a way that renders language pure surplusage") (internal citations omitted). That is, if the new construction had to be smaller than the rehabilitated existing building, the ancillary newly-constructed units could not have exceeded 100% of the units contained in the rehabilitated structure, much less have reached 175% of the units contained in the rehabilitated structure.

Question 3 of Appellants' Statement of Questions: Setback Requirements

Appellants argue that the proposed project does not meet the setback requirements

13

of the Zoning Ordinance on the westerly side of the building and on the southerly side adjacent to Appellants Hockert-Lotz and Bjerke's property.

The parties do not dispute that the project satisfies the setback requirements of the ordinance along the North Avenue (easterly) frontage. They agree that the easterly lot line is a "front" lot line and that the front setback for the building's three stories satisfies the exception in §5.3.6(h) for front yard setbacks, which allows it to encroach into the front yard provided that it does not exceed the existing front yard setback. That section renders the project subject to design review and a determination of compatibility with adjoining properties, which remain for the hearing on the merits.

The parties do not dispute that the project satisfies the setback requirements of the ordinance along the northerly lot line. They agree that the northerly lot line is a side lot line, that the existing building is built almost to the lot line and the upper stories are stepped back to meet the required ten percent of lot width for a side setback.

The parties do not dispute that the project satisfies the setback requirements of the ordinance along the portion of the southerly lot line with frontage on Berry Street. That is, they agree that at least that portion of the southerly lot line is a "front" lot line and that the front setback satisfies the exception in §5.3.6(h) for front yard setbacks. However, the parties dispute which setback requirements are applicable to the westerly lot line and to the southerly lot line west of the intersection of Berry Street with Lakeview Terrace.

The project lot is a corner lot, as it abuts two streets, North Avenue and Berry Street, at their intersection. §30.1.2 (definition of "Lot, corner"). As a corner lot, the lot has more than one front yard, one facing North Street and one facing Berry Street. §5.3.5(a).

Although the Court understands Appellants' intuitive argument that the portion of the southerly lot line that does not front on Berry Street should be treated as a side yard where it abuts the side yard of the Bjerke lot, such an approach is not consistent with the express definition of the term front yard in §30.1.2 of the Zoning Ordinance. Moreover,

14

such an approach would conflict with the City Zoning and Planning staff's and DRB's consistent interpretation of the Zoning Ordinance, which is entitled to deference in a close case. In re Kisiel, 172 Vt. 124, 133 (2000) Appeal of Korbet, 2005 VT 7, ¶10; 178 Vt. 459, 462 (2005); see also Levine v. Wyeth, 2006 VT 107, ¶¶30–31; Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 844 (1984).

Section 30.1.2 defines "front yard" as "the open, unoccupied space extending across the full width of the lot and lying between the street[9] line of the lot and the nearest line of the building" (emphasis added). Under that definition, the full southerly lot line must be treated as a front yard under the ordinance, requiring a fifteen-foot front setback across the full width of the lot for any new construction not satisfying the §5.3.6(h) exception. Table 5-D. The fifteen-foot "front" setback therefore applies to the southerly side of the westerly building segment, adjacent to the Bjerke side lot line.

The westerly lot line of the project lot adjoins a steep embankment on City-owned land. Appellants argue that this yard should be treated as a rear yard, requiring a setback of 25% of the ninety-foot lot width, or 22½ feet. Table 5-C. Appellee-Applicant argues that the westerly yard is a side yard, for which the setback is required to be 10% of the lot width, not to exceed twenty feet.

Section 5.3.5 states that corner lots have more than one front yard, and that side yards extend back from the front yard, between the property line and the nearest point of the building "to the rear yard or rear lot line." While the Zoning Ordinance might have been clearer if §5.3.5 had specified that, for corner lots with more than one front yard, the corresponding side yards intersect, or extend from the front yard to the "opposite" lot line rather than the "rear" lot line, we must construe an ordinance to avoid an absurd result.

_____

[9] The term "street" is defined in §30.1.2 to include the entire width of the public way between property lines, making the "street line" of a lot its property line.

Will v. Mill Condominium Owners' Ass'n, 2004 VT 22, ¶15, 176 Vt. 380, 387–88 (2004). To avoid the absurd result of a "front" and a "rear" lot line being adjacent to and forming a corner with one another, the lot line adjacent to a front lot line must be construed to be a side lot line and not a rear lot line. See also definition of "yard, side" in §30.1.2. That is, the necessary consequence of the Ordinance's definition of corner lots as having more than one front yard is that each side yard extends from its adjacent front lot line or front yard to the opposite lot line, which in the present case is also a side lot line.[10]

Even if the definition of side yard were considered to be ambiguous in the case of a corner lot, in interpreting an ambiguity the Court is charged both with resolving any ambiguity in favor of the landowner, In re Weeks, 167 Vt. 551, 555 (1998), and with giving weight to the interpretation by the administrative body charged in the first instance with the implementation of the ordinance. In re Kisiel, 172 Vt. 124, 133 (2000). Using these rules of construction to apply the Zoning Ordinance as a whole to the configuration of the lot in the present case, we determine that the westerly lot line defines a side yard. Thus, the required setback from the westerly lot line[11] is a side setback of 10% of the lot width, not to exceed twenty feet.

Question 4 of Appellant's Statement of Questions: Parking Requirements and Waiver

---

[10] This interpretation is also consistent with this Court's prior consideration of corner lots under the City's Zoning Ordinance, however, the configuration of the lots in those cases did not present the same issue with regard to the side lot lines as in the present case. See In re: Appeal of Comi, Docket No. 95-6-04 Vtec, slip op. at 2 (Vt. Envtl. Ct., Mar. 14, 2005); In re: Appeal of Green Mountain Habitat for Humanity, Docket No. 19-1-02 Vtec, slip op. at 5 (Vt. Envtl. Ct., Dec. 12, 2002).

[11] No party disputes that the setback should be measured from the property line of the former 0.65-acre parcel, rather than from the additional property acquired from the City, due to the limiting language in that deed. See footnote 1, above.

Appellee-Applicant's project proposes the construction of a ground floor parking garage. The plans for the garage depict thirty parking spaces, including two handicapped-accessible spaces. Appellee-Applicant proposes to dedicate two parking spaces within the garage to the restaurant use. Appellee-Applicant characterizes the garage as having thirty-nine spaces, including nine so-called tandem spaces, intending to assign the tandem spaces so that nine of the units would be allocated two parking spaces each. The nine tandem spaces are not shown on any graphic exhibit submitted to the Court in connection with the present motions. Appellee-Applicant also proposes to provide bicycle parking within the garage both for the residents and for customers of the restaurant-café.

Under §10.1.5 of the Zoning Ordinance, a change or expansion of use of a structure requires that the parking requirements of the Ordinance be met. Absent any applicable waiver, Table 10-A of the Ordinance requires two parking spaces for each of the twenty-five condominium units. The parties agree that the condominiums therefore require fifty spaces, absent any waiver.

With regard to the restaurant-café, one parking space is required for every four restaurant seats, for a total of ten spaces on that basis for the proposed forty-seat restaurant. In addition to those ten spaces, footnote 3 to Table 10-A of the Ordinance requires one parking space for every seventy-five square feet of restaurant floor area without seats but intended for patron use. In addition to the parking spaces, for the restaurant use §10.1.9 and Table 10-B require one loading space at least 250 square feet in area for each 3,000 feet of gross floor area or part thereof.

Based on these provisions, Appellants argue that eight additional parking spaces are needed for the restaurant-café (because of additional space needed for non-seated patrons, including both indoor space (estimated at 150 square feet) and outdoor patio space (estimated at 425 square feet)). Appellants also argue, but without an accompanying calculation of gross floor area, that two loading spaces are required for the restaurant, for

17

a total of sixty-eight parking spaces and two loading spaces. Appellee-Applicant's waiver request is based upon the calculation that a total of sixty spaces are required for the project, without regard to the loading space requirement.

Material facts are in dispute as to how much restaurant floor area without seats is intended for patron use and whether any of the outdoor patio in front of the building should be counted as restaurant floor area, as well as whether a gross floor area calculation would require a second off-street loading space for the restaurant. Material facts are therefore in dispute as to the number of parking spaces and loading spaces that would be required for the project absent any waiver.

Pursuant to §§10.1.19 and 10.1.20, Appellee-Applicant requests a waiver of twenty-one parking spaces (thirty-five percent of its view of the parking space requirements for the project) if the tandem spaces were to be included, or a waiver of thirty parking spaces (fifty percent of its view of the parking space requirements for the project), if the tandem spaces are not included, as well as a waiver of the loading space requirement under §§10.1.19 and 10.1.20.

Section 10.1.19 allows the DRB, and hence this Court, to reduce any of the parking requirements to the extent that an applicant can demonstrate that the regulation is unnecessarily stringent for reasons of unique use times, shared or dual use, the availability and projected use of alternate modes of transportation, and/or an anticipated reduction in vehicle ownership in connection with the construction of affordable housing. The grant of a parking waiver is limited to no more than 50% of the required spaces, except that §10.1.20 provides for a greater waiver for, in pertinent part, affordable housing units and off-street loading spaces.

Section 10.1.16 allows single detached dwellings and duplexes to have tandem parking spaces. Under that section, other parking facilities must "be designed so that each motor vehicle may proceed to and from the parking space provided for it without the

moving of any other motor vehicle."

Appellee-Applicant argues that §10.1.19 allows the Court to waive the tandem parking restriction, but that it has provided sufficient parking spaces without counting the tandem spaces to meet the requirements of the ordinance, with the available waivers. When §10.1.19, regarding parking waivers, is read together with §10.1.20, regarding limits on parking waivers, which refers to the percentage of the <u>number</u> of required spaces that may be waived, it is apparent that parking waivers are only available with regard to the required <u>numbers</u> of different types of spaces, and not to their configuration or safe design. Accordingly, the tandem parking restriction may not be waived. In any event, material facts are in dispute, or at least have not been provided to the Court, as to the location of the proposed tandem spaces or the maneuvering path by which the vehicles could reach any particular spaces within the garage structure.

Material facts also remain in dispute as to whether the factors to be considered in §§10.1.19 and 10.1.20 show that the parking requirements otherwise applicable to the project are unnecessarily stringent in this case, and therefore justify a waiver. In particular, material facts are in dispute, or have not been provided in connection with the motions, to support any determination by the Court as to the <u>projected use</u> of alternate transportation modes, including walking, bicycling, and the use of public bus transportation, the level of anticipated reduction in vehicle ownership in connection with the four affordable housing units proposed in this project, or the shared or dual use of any of the spaces as between the condominiums and the restaurant patrons.

Material facts have not been provided regarding the number of parking spaces on North Avenue and Berry Street not used by neighborhood residents, and available for either the residents or the restaurant patrons of the proposed project, or whether any of those spaces should be considered in connection with the waiver of any of the parking spaces or loading spaces otherwise required by the project.

19

Accordingly, the issues of the number of parking and loading spaces required for the building absent any waiver, and whether the project qualifies for the waiver of any of the required spaces, remain for trial.

Question 8 of the Statement of Questions, whether the proposed project complies with §20.1.6 of the Zoning Ordinance relating to non-conforming uses

As to the residential use, the proposed project is a conforming use in the district; that is, it is an allowed use if it meets the standards for approval in the ordinance. The enlargement of the building for additional residential use is covered by §20.1.7 and is permissible so long as it does not create any new dimensional or parking noncompliance. It will not create any new dimensional noncompliance. Resolution of whether it will or will not create any new parking noncompliance depends on whether it qualifies for a parking waiver and, if so, how many spaces may be waived.

That leaves only the issue of whether the conversion of the front of the existing building to a 2,247-square-foot restaurant-café with forty seats meets the provisions of §20.1.6(c) for a change in a nonconforming use. Section 20.1.6(c) provides that a nonconforming use may not be altered in use except to an allowed use, unless it qualifies for approval under §5.1.8. Section 5.1.8 allows the DRB, and hence this Court, to approve a change from one nonconforming use to another if the new use meets the requirements for conditional use approval, and is "less harmful or detrimental to the neighborhood than the existing use."

According to Appellee-Applicant, the prior nonconforming use of the building for a commercial import business and its distribution warehouse ceased on June 23, 2004. Under §20.1.6(d) a nonconforming use could not have been re-established in the building if that use had been discontinued for more than a year, that is, by June 22, 2005, except if the Zoning Administrator extended that time for another year as provided in §20.1.6(f).

20

The application for the present proposal was filed on January 31, 2005, and revised in February of 2005. The Design Advisory Board reviewed it at its February 15, 2005 meeting and suggested further revisions. Appellee-Applicant submitted revised plans aimed at addressing the Design Advisory Board recommendations. The DRB initially reviewed the proposal at its March 22, 2005 meeting, and recessed the public hearing to allow Appellee-Applicant additional time to address certain items. On April 4, 2005, the Conservation Board reviewed the project's stormwater and erosion control plans and effects of the project on the view of the City from the waterfront.

On May 4, 2005, Appellee-Applicant applied for an extension of the §20.1.6(d) deadline. Meanwhile, the DRB held a further public hearing on May 31, 2005. It issued combined minutes of the meeting and findings of fact for the decision in a written decision dated June 10, 2005, granting major impact and design review approval of the project, which it described as "a proposed 25 residential unit adaptive reuse of an existing commercial structure at 237 North Avenue and associated site improvements, including the conversion of part of the building to a restaurant/café." The Zoning Administrator granted an extension of the §20.1.6(d) deadline on June 17, 2005, extending the deadline to June 22, 2006, based on Appellee-Applicant's good faith efforts towards approval of a project "that utilizes the non-conforming status of this property." Appellants' appeal of the DRB decision was filed on June 24, 2005 and forwarded to the Court which received it on June 27, 2005.

Any delay in resuming any approved nonconforming use of the building since the appeal was filed has been due to litigation brought by parties with standing to oppose construction, and not to any lack of good-faith efforts on the part of Appellee-Applicant to pursue its permit for the proposed project. The filing of this appeal therefore tolled the expiration of the extended abandonment or discontinuance period. See Preseault v. Wheel, 132 Vt. 247, 253 (1974); see also Nat'l Waste Managers, Inc. v. Anne Arundel County, 763

21

A.2d 264, 279–280 (Md. Ct. Spec. App. 2000).

Material facts are disputed as to whether the proposed restaurant-café satisfies the requirements of §5.1.8; that is, whether it meets the requirements for conditional use approval, as well as whether it is less harmful or detrimental to the neighborhood than the prior commercial use. These issues remain for trial.

Question 9 of the Statement of Questions, whether the proposed project complies with §5.3.1 relating to dimensions of the proposed buildings

Section 5.3.1 refers applicants to Table 5-C regarding the regulations for each district pertaining to lot coverage, setbacks, minimum lot size, and building height.

The parties do not appear to dispute any issues regarding minimum lot size, building height, or lot coverage. The disputed setback issues were argued with respect to Question 3.

Accordingly, although the parties did not move for summary judgment on Question 9, they should be prepared to state at the telephone conference scheduled in the final paragraph of this decision whether any issues remain from Question 9 other than the setback issues addressed in Question 3.

Question 10 of the Statement of Questions - whether the 2004 amendment of §5.2.6 of the Zoning Ordinance was unconstitutional "spot zoning"

Appellants argue that a 2004 amendment to the Burlington Zoning Ordinance, ZA #2004-01, which had the effect of enabling the proposed density of Appellee-Applicant's project, constituted improper "spot zoning" in violation of the equal protection requirement of the 14th Amendment to the United States Constitution.

A so-called 'adaptive reuse' provision has been present in the Zoning Ordinance for over thirty years. On May 28, 2004, the Burlington City Council approved an amendment

22

to §5.2.6(b)(2) of the Zoning Ordinance, which was the then-existing 'adaptive reuse' exception to the maximum density provisions applicable to the Residential Medium-Density zoning district. As in the present section, the former §5.2.6(b)(2) allowed a density of up to forty units per acre for adaptive reuse or residential conversion projects, provided that lot coverage did not exceed 80%; however, it also contained the additional limitation requiring that the "number of ancillary newly-constructed units shall not exceed [175%] of the units contained in the rehabilitated structure(s)." §5.2.6(b)(2)(B) (amended May 28, 2004).

Zoning enactments are entitled to a presumption of validity. In re Letourneau, 168 Vt. 539, 544 (1998); Galanes v. Town of Brattleboro, 136 Vt. 235, 240 (1978). To determine whether a zoning amendment constitutes illegal "spot zoning" as it relates to a specific parcel of land, the Vermont Supreme Court applies the following four-factor test: (1) whether the use of the affected parcel is very different from the prevailing use of other parcels in the area; (2) whether the area of the affected parcel is small; (3) whether the classification is for the benefit of the community or only to provide a specific advantage to a particular landowner; and (4) whether the change in the zoning classification complies with the municipality's plan. Granger v. Town of Woodford, 167 Vt. 610, 611 (1998); Smith v. Town of St. Johnsbury, 150 Vt. 351, 361-62 (1988).

The zoning amendment at issue in the present case differs from one which singles out a particular parcel to change its use classification to one more favorable to a particular landowner or developer. While it appears that this particular zoning amendment was prompted by problems brought to the City's attention at a meeting between the City and Appellee-Applicant regarding the present project, the zoning amendment itself does not change the use classification of this or any particular parcel.

Rather, the 2004 amendment removed one limitation from an exemption already in the Zoning Ordinance. The potential for additional residential units due to the removal of

that limitation was applicable to any proposed adaptive reuse or residential conversion project that might have been proposed within any of the City's Residential Medium-Density Districts. The City's evidence suggests that forty-nine properties were potentially affected by this amendment. Although Appellants contest this number, they do not contest that the amendment applied to at least fifteen to twenty properties in the City's various Residential-Medium Density districts. Thus, the fact that it may have been this particular proposal which prompted the introduction of the zoning amendment does not amount to illegal 'spot zoning' because the proposed zoning amendment applies generally within the Residential-Medium Density districts, as was the case in In re: Appeal of Wilkens, Docket No. E96-051 (Vt. Envtl. Ct., Aug. 23, 1996) (creation of Historic Inn use category in connection with the Willard Street Inn), and not only to this property. See also Williams, et al. v. Village of Woodstock, Docket No. S 168-94 Wrc (Windsor Superior Ct., Nov. 28, 1997).

Nor does the amendment amount to spot zoning under any of the other criteria. Most importantly, removal of the 175% limitation benefits the community in that it increases needed residential units as provided in the Municipal Development Plan; it does not provide a specific advantage only to this particular landowner. In addition, the land area of the fifteen to forty-nine potentially affected parcels is not particularly small. Moreover, removal of the 175% limitation allows more parcels to be converted to residential use in residential zoning districts, making the use of the affected parcels by definition similar to the prevailing use of other parcels in the various Residential-Medium Density districts. In that respect, the amendment is also consistent with the general goal of zoning to eliminate or reduce nonconforming uses. In re Casella Waste Mgmt., Inc., 2003 VT 49, ¶9; In re Gregoire, 170 Vt. 556, 558 (1999).

To the extent that an adaptive reuse project may also allow the conversion of a nonconforming use to a different nonconforming use in the district, that aspect of such a

project would not have been affected by the amendment; that is, it would have been allowed or not allowed under §5.1.8, without regard to the removal of the 175% limitation.

Moreover, to the extent that the City's Municipal Development Plan promotes adaptive reuse and residential conversion as a vehicle to eliminate nonconforming uses, to convert existing structures to more conforming uses, and to increase the amount of housing available in the City, removal of the 175% limitation complies with the municipality's plan. See 2001 Municipal Development Plan §§ I-2, I-5, IV-6, and discussion at p. 12, above.


Preclusive Effect of Act 250 Permit

During the pendency of these motions, the District Commission granted an Act 250 Land Use permit for the project, and no party appealed that decision. Appellee-Applicant argues that because the same parties participated before the District Commission and did not appeal, that their lack of appeal of the Act 250 issues should have preclusive effect on the similar municipal issues in the present appeal. An administrative decision can have preclusive effect on a judicial proceeding if the administrative body was acting in a judicial capacity and it resolved disputed issues of fact properly before it, which the parties had an adequate opportunity to litigate. Trickett v. Ochs, 2003 VT 91, ¶10–11, 176 Vt. 89, 93–94 (2003); Sheehan v. Dep't of Employment and Training, 169 Vt. 304, 305, 308 (1999).

There is no question that certain of the issues in the municipal case overlap with issues concluded by the Act 250 case. This overlap was the reason that the Court had planned to consolidate the two appeals and hold a single evidentiary hearing to take evidence in both cases. However, although the underlying evidence may have warranted a single hearing if the Act 250 permit had been appealed, the standards applicable to the proposal from the Zoning Ordinance are not the same as the standards that were required to be applied by the District Commission, with the exception of the requirement of

§13.1.6(j) that the project "be in substantial conformance with the city's municipal development plan." On the Act 250 criteria other than Criterion 10, the fact that the District Commission made determinations regarding, e.g., the adequacy of parking, or the lack of undue adverse effect on traffic or aesthetics, does not have a preclusive effect on the resolution of the analogous issues in the municipal appeal, because the applicable standards are different. However, with regard to the municipal issue of "substantial conformance with" the municipal development plan, the standard the District Commission was required to apply was whether the project is "in conformance with" the City's plan. 10 V.S.A. §6086(a)(10). As in the municipal case, the burden of proof was on the applicant. The issue was resolved by a final decision in the Act 250 proceeding, and it was the same parties who had a full and fair opportunity to litigate it before the District Commission. Applying preclusion to that issue is fair. In re Central Vermont Pub. Serv. Corp., 172 Vt. 14, 20 (2001), cited in Trickett v. Ochs, 2003 VT 91 at ¶10. Accordingly, Appellants' failure to appeal the issuance of the Act 250 permit has preclusive effect on Question 1 of the Statement of Questions, concluding it in favor of Appellee-Applicant.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that summary judgment is GRANTED in favor of Appellee-Applicant as to Question 2 of the Statement of Questions. As to Question 3 of the Statement of Questions, summary judgment is GRANTED in favor of Appellee-Applicant. As to Question 4 of the Statement of Questions, summary judgment is GRANTED in favor of the City and Appellants in that the prohibition against tandem spaces cannot be the subject of a waiver, but summary judgment is otherwise DENIED as material facts are in dispute. As to Question 8 of the Statement of Questions, summary judgment is GRANTED in favor of Appellee-Applicant in that the prior nonconforming use was not abandoned, but summary judgment is otherwise DENIED as material facts are in dispute. As to Question 10 of the Statement of

26

Questions, summary judgment is GRANTED in favor of the City and Appellee-Applicant.

As to the relationship between the unappealed Act 250 permit and the municipal permit on appeal here, preclusive effect is granted on the question of whether the application complies with the municipal plan, and accordingly summary judgment is GRANTED in favor of Appellee-Applicant as to Question 1 of the Statement of Questions.

A telephone conference is scheduled for December 20, 2006 (see enclosed notice) to schedule the hearing on the merits on the remaining issues in this appeal. The parties should be prepared to discuss whether any issues remain for trial as to Article 5 of the Zoning Ordinance relating to use (Question 7 of the Statement of Questions) and whether any issues remain for trial as to Question 9 of the Statement of Questions, other than the setback issues that are the subject of Question 3. Please be prepared to discuss the amount of time needed for the remainder of the hearing, the parties' and witnesses' availability from January 2, 2007 through February 14, 2007 and from mid-March through mid-May of 2007, and whether mediation would be useful (to be scheduled between now and the earliest date of trial) now that several legal issues have been resolved by summary judgment.

Done at Berlin, Vermont, this 14th day of December, 2006.

_____
Merideth Wright
Environmental Judge

27