STATE OF VERMONT

SUPERIOR COURT                                    ENVIRONMENTAL DIVISION

| | |
|---|---|
| Diverging Diamond Interchange SW Permit | Docket No. 50-6-16 Vtec |
| Diverging Diamond Interchange A250 | Docket No. 169-12-16 Vtec |

**Decision on Motion to Dismiss Questions**

These coordinated matters are an appeal of an Act 250 permit and an appeal of a stormwater permit, both for the Diverging Diamond Interchange proposed at Interstate 89, Exit 16 in Colchester (the Project).[1]

Now before the Court is the Vermont Agency of Transportation's and the Natural Resource Board's motions to dismiss RL Vallee, Inc.'s Act 250 Questions.

The Vermont Agency of Transportation (VTrans) is represented by Justin E. Kolber, Esq., Jenny E. Ronis, Esq., and John K. Dunleavy, Esq.

The Natural Resource Board (NRB), represented by Gregory J. Boulbol, Esq. and Peter J. Gill, Esq., joins Vtrans' motion in part.  The Agency of Natural Resources (ANR), represented by Hannah W. Smith, Esq. and Kane Smart, Esq., filed a response partly supporting the motion.

RL Vallee, Inc. (Vallee), represented by Jon T. Anderson, Esq. and Alexander J. LaRosa, Esq., filed an opposition to the motion.  Conservation Law Foundation (CLF), represented by Elena M. Mihaly, Esq., filed a response partly opposing the motion.  Timberlake Associates, LLC (Timberlake), represented by David L. Grayck, Esq., and Costco Wholesale Corporation, represented by Mark G. Hall, Esq., did not respond to the motion.

---

[1] In Docket No. 50-6-16 Vtec, RL Vallee, Inc. appeals Individual Stormwater Discharge Permit No. 6946-INDS, issued on May 11, 2016 by the Vermont Agency of Natural Resources to the Vermont Agency of Transportation for the Diverging Diamond Interchange proposed at Interstate 89, Exit 16.  In Docket No. 169-12-16 Vtec, RL Vallee, Inc. and Timberlake Associates, LLC appeal Act 250 permit #4C1271 and permit amendments #4C0676R-16, #4C0288-21, #4C0757-24, and #4C0471-7, issued jointly on November 28, 2016 by the District #4 Environmental Commission to the Vermont Agency of Transportation for the construction of the Diverging Diamond Interchange and related improvements.

**Procedural History**

In the stormwater appeal, Docket no. 50-6-16 Vtec, Vallee filed its original Statement of Questions on June 24, 2016. On May 25, 2017, Vallee filed an amended Statement of Questions along with a motion to amend the Statement of Questions. We granted the unopposed motion in a July 16, 2017 Entry Order.

In the Act 250 appeal, Docket no. 169-12-16 Vtec, Vallee filed its Statement of Questions on January 10, 2017, and Timberlake filed its Statement of Questions on January 12, 2017.

In an October 11, 2017 decision on cross motions for summary judgment, we granted judgment on stormwater amended Questions 1, 3, and 6–18, and denied judgment on Act 250 Questions 5, 6, and 11.

At a December 4, 2017 status conference and in an Entry Order issued the same day, the Court addressed revisions and clarifications to Vallee and Timberlake's Statements of Questions. The Court ordered Vallee to clarify one of the three remaining questions in the stormwater appeal and all its Act 250 questions by December 15, 2017. At the conference, Timberlake offered to adopt Vallee's revised Act 250 questions. Noting that some of Timberlake's questions raised issues not presented in Vallee's original questions, the Court instructed Timberlake to either dismiss its questions and only pursue Vallee's revised questions, or to file its own revised questions by December 15, 2017.

On December 11, 2017, Vallee filed an "Amended and Clarified Statement of Questions" in the two dockets presenting six questions (with additional sub-parts) in the Act 250 appeal and three questions in the stormwater appeal. Timberlake has not filed a revised Statement of Questions.

**Discussion**

**I.    Timberlake's Act 250 Appeal Questions**

Timberlake has failed to follow the Court's directive to dismiss its questions or file a revised Statement of Questions. Timberlake has represented it would adopt Vallee's revised questions. We therefore **DISMISS** all questions raised in Timberlake's January 12, 2017 Statement of Questions.

2

## II.     Motion to Dismiss: Scope and Standard of Review

VTrans' moves to dismiss Questions 1(a), 1(b), 1(c), 2(b), 2(c), 2(d), 3(a), 5(a), and 6(a)(i)–(vii) in the Act 250 appeal, and to clarify Question 3 in the stormwater appeal.

The NRB joins VTrans' motion to dismiss Questions 5(a) and 6(a)(i-vii).

ANR supports dismissal of Questions 1(a), 1(b), 1(c), 2(b), 2(c), 2(d), and 3(a).

Vallee opposes the motion on all questions.

CLF opposes the dismissal of 1(a), 1(b), 1(c), 2(b), 2(c), and 3(a).

In considering a motion to dismiss we "take the factual allegations [of the nonmoving party] as true, and consider whether it appears beyond doubt that there exist no facts or circumstances that would entitle the [nonmoving party] to relief." Colby v. Umbrella, Inc., 2008 VT 20, ¶ 5, 184 Vt. 1 (citations omitted).[2]

Although filed as a motion to dismiss, VTrans suggests that the motion could be framed as a motion for summary judgment.  Because the motion includes neither a statement of material facts, nor affidavits or other evidentiary material to support factual assertions, we take it as a motion to dismiss.

## III.     Chloride and Phosphorus (Act 250 Questions 1(a), 1(b), 1(c), 2(b), 3(a))

Vallee's Act 250 Question 1 asks whether the Project will cause undue water pollution in violation of Criterion 1 due to increased discharges of: (a) chloride to Sunnyside Brook, or (c) chloride to groundwater.  Question 1(b) asks whether the Project will cause undue water pollution in violation of Criterion 1 due to increased discharges of phosphorus to Lake Champlain. Question 2(b) asks whether the Project will violate the Vermont Groundwater Protection Rules due to the discharge of chloride into groundwater, in violation of Criterion 1(B).  Question 3(a) asks whether, pursuant to Criterion 1(E), the Project will maintain the natural condition of Sunnyside Brook despite increased chloride discharges to the brook.

Because the Court has already concluded chloride and phosphorus cannot be raised in the stormwater appeal, VTrans argues the Court should conclude the same in the Act 250 appeal.

---

[2] Because an appellant in the Environmental Division files a Statement of Questions, rather than a complaint, we depart from the civil practice of focusing on factual allegations made in the *complaint*, and instead look to factual allegations as made more broadly.  See, e.g., R.L. Vallee, Inc., et al. MS4, No. 122-10-16 Vtec, slip op. at 1 n.2 (Vt. Super. Ct. Envtl. Div. May 2, 2017) (Walsh, J.).

VTrans asks the Court to dismiss Questions 1(a), 1(b), 1(c), 2(b), 3(a) to the extent that address chloride and phosphorus in stormwater.

Vermont has a comprehensive regulatory regime controlling stormwater runoff, which is set out in statutes, rules, policies, and procedures.  See, e.g., 10 V.S.A. § 1263–64; Stormwater Management Rule, 16-3 Vt. Code. R. § 505; Vermont Water Quality Standards, 16-5 Vt. Code. R. § 100.  On October 3, 2014, VTrans applied for a stormwater permit for the Project pursuant to this regulatory regime.  Diverging Diamond Interchange SW Permit & A250, Nos. 50-6-16, 169-12-16 Vtec, slip op. at 14 (Vt. Super. Ct. Envtl. Div. Oct. 11, 2017) (Walsh, J.).  VTrans submitted its Act 250 application before submitting the stormwater permit application.[3]

At the time the applications were submitted, there were no chloride standards or phosphorus limitations for stormwater runoff in the Project area.  Id.  The comprehensive regulatory regime controlling stormwater therefore left chloride and phosphorus in stormwater unregulated.  The regulatory regime was later changed to regulate chloride and phosphorus.  Because the stormwater permit application vested in a scheme that left phosphorus and chloride unregulated, we barred Vallee from raising allegations that the Project discharges too much phosphorus and chloride via stormwater runoff.  Id.

Vallee now seeks to apply chloride and phosphorus standards to the same stormwater runoff, from the same Project, through the Act 250 appeal.  The Act 250 application, however, vested in the same regulations as the stormwater application.  These regulations do not regulate chloride and phosphorus.  Allowing Vallee to allege excessive chloride and phosphorus in stormwater runoff in the Act 250 matter would negate our vested rights doctrine by allowing Vallee to substitute the regulatory regime in effect when the Act 250 appeal was filed (in which chloride and phosphorus were unregulated) with a subsequently-enacted or alternative regulatory regime (in which chloride and phosphorus are regulated).

In addition to turning our vested rights doctrine on its head, allowing Vallee to raise concerns about chloride and phosphorus would lead to absurd results in the Act 250 and stormwater permitting schemes.  As Vallee and CLF point out, VTrans was only required to obtain

---

[3] There is some dispute or confusion regarding whether a complete application sufficient to vest rights was submitted November 21, 2013, or June 4, 2014.  This issue is discussed further below.

a stormwater permit for part of the total project area that is covered by the Act 250 permit. We can thus infer that under the regulatory regime for stormwater, the remaining area covered by the Act 250 permit does not need a stormwater permit. Vallee and CLF now argue that to the extent the stormwater permit creates a rebuttable presumption of compliance with Criterion 1 (see 10 V.S.A. § 6086(d); Act 250 Rule 19(E)(1)(b)), that presumption extends only to the area covered by the permit. They submit that VTrans must still show the remaining area that is not covered by the permit will not create excessive phosphorus and chloride in stormwater runoff. This argument would involve applying more stringent controls to stormwater runoff from the portion of the project that never needed a stormwater permit in the first place, and less stringent stormwater controls to the part that does require a stormwater permit—an absurd outcome.

Because the Act 250 permit application vested in a regulatory scheme in which chloride and phosphorus in stormwater runoff was unregulated, Questions 1(a), 1(b), 1(c), 2(b), 3(a) raise issues for which no relief may be granted. To the extent that these questions address chloride and phosphorus in stormwater runoff, they are **DISMISSED**.

VTrans suggests that Question 3(a) may raise the impact of chloride from the "bounce and scatter" of road salt, or other "non-stormwater-based chloride impacts." Mot. Dismiss at 6–7. The motion to dismiss Question 3(a) is **DENIED** to the extent that question raises non-stormwater-based chloride impacts.

### IV.    Act 250 Question 2(b): Criterion 1(B) and the Groundwater Protection Rule

Vallee's Act 250 Question 2(b) asks whether the Project will violate the Vermont Groundwater Protection Rules due to the discharge of chloride into groundwater, in violation of Criterion 1(B).

For the reasons set out above, we limit Question 2(b) to non-stormwater-based chloride impacts on groundwater. VTrans moves to dismiss this question in part because the Groundwater Protection Rule was not raised before Vallee filed its clarified and amended questions.

Vallee's original Questions 5 and 6 asked whether the Project "satisf[ies] the requirements of" Criteria 1 and 1(B). These questions were very broad. Criterion 1(B) requires projects to comply with Department of Environmental Conservation regulations "regarding the

5

disposal of wastes" and to not "involve the injection of waste materials or any harmful or toxic substances into ground water or wells." 10 V.S.A. § 6086(a)(1)(B). The language of this Criterion is broad enough to require compliance with the Groundwater Protection Rule, even if that rule is not explicitly named in the Statement of Questions. See Groundwater Protection Rule 16-3 Vt. Code. R. § 502:12-102 (explaining policy of the rule); In re Atwood Planned Unit Dev., 2017 VT 16, ¶ 15 (Mar. 17, 2017). Vallee's Amended and Clarified Questions eliminate original Questions 5 and 6, and add Question 2(b). Because Amended and Clarified Question 2(b) raises compliance with the Groundwater Protection Rule, and compliance with that rule generally falls into Criteria 1 and 1(b), we disagree with VTrans that Vallee raises a new issue not encompassed in its original Statement of Questions by invoking the Groundwater Protection Rule.

Our analysis does not end here, however. In its memorandum, ANR raises the question of whether Vallee's party status under Criteria 1 and 1(B) extends to groundwater issues. See V.R.C.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); Unifund CCR Partners v. Zimmer, 2016 VT 33, ¶ 19, 201 Vt. 474 (standing is an element of subject matter jurisdiction).

At the close of the proceeding before the District Commission for this permit, Vallee did not retain party status as to Criteria 1, 1(B), or 1(E). Vallee therefore moved for party status under these criteria when it filed its notice of appeal. In re Diverging Diamond Interchange Act 250, No. 169-12-16 Vtec, slip op. at 1 (Vt. Super. Ct. Envtl. Div. Mar. 17, 2017) (Walsh, J.). In its motion, Vallee argued that stormwater from the Project would carry undue water pollution onto its property and into its groundwater. Id. at 3. We concluded, however, that Vallee failed to support the assertion as to groundwater, explaining that "Vallee has . . . failed to show a specific, non-speculative potential impact regarding its groundwater." Id. (citation omitted). We nevertheless granted Vallee party status under Criteria 1, 1(B), and 1(E) based on the potential impacts of stormwater runoff. Id. at 3–5.

Once granted party status under a given Criterion, the scope of that status generally extends to the full reach of that Criterion, unless the District Commission or this Court on appeal specifically carves out a part of that Criterion under which the party does not have party status. In re Rinker's, Inc., No. 302-12-08 Vtec, slip op. at 2–4 (Vt. Envtl. Ct. Sep. 17, 2009) (Wright, J.).

6

Here, Vallee argued that it had party status under Criterion 1 based on potential impacts from stormwater runoff and to its groundwater.  We rejected the assertion as to groundwater, but granted it status based on potential impacts from stormwater runoff.  To now allow Vallee to raise issues regarding the Project's potential impact on groundwater would undermine that decision.

Because Vallee failed to establish grounds for party status on potential impacts to groundwater, VTrans' motion to dismiss Question 2(b) insofar as it raises non-stormwater-based chloride impacts on groundwater is **GRANTED**.

V.      **MS4 and TS4 Permits**

a.  **Act 250 Question 2(c): Criterion 1(B) and the Vermont Water Pollution Control Regulations**

Vallee's Act 250 Question 2(c) asks whether, pursuant to Criterion 1(B), VTrans is "in compliance with the 1991 Amendment to Rule 13.12 of the Vermont Water Pollution Control Regulations, Chapter 13 in particular subsection F.6 Duty to Operate and Maintain? In . . . answering this question this Court will have to address whether VTrans is in compliance with its MS4 Permit, and to the extent the TS4 Permit replaces the MS4 Permit, whether VTrans is in compliance with the TS4 Permit."

Under Criterion 1(B), the applicant must demonstrate that the proposed project "will meet any applicable Health and Environmental Conservation Department regulations regarding the disposal of wastes, and will not involve the injection of waste materials or any harmful or toxic substances into ground water or wells."  10 V.S.A. § 6086(a)(1)(B).

Vermont Water Pollution Control Permit Regulations, 16-3 Vt. Code. R. § 301:13.12(F)(6), reads as follows:

> Duty to Operate and Maintain - The permittee shall properly operate and maintain any permitted facility in good condition. The condition of the permitted facility shall at no time contribute to a violation of the terms, conditions, requirements, limitations and restrictions specified by the general permit.

Subsection 13.12(F)(6) of Rule 301 is a part of a larger Department of Environmental Conservation (DEC) regulation addressing permits.  More specifically, 13.12(F)(6) requires compliance with DEC permits.  Criterion 1(B) requires compliance with "applicable" DEC regulations.  Question 2(c) therefore appears to argue that because Criterion 1(B) requires

7

compliance with DEC regulations, and 13.12(F)(6) is a DEC regulation which in turn requires compliance with DEC permits, then Criterion 1(B) requires compliance with DEC permits, including the MS4 and TS4 permit.

It is the purview of the District Commission, and this Court on appeal, to determine what regulations are "applicable" under Criterion 1(B). Hawk Mountain Corp., #3W0347-EB, slip op. at 16 (Vt. Envtl. Bd. Aug. 21, 1985), aff'd 149 Vt. 179 (1988). For the following reasons, we conclude that 13.12(F)(6) is not an "applicable [DEC] regulation" under Criterion 1(B) in a way that would require VTrans to demonstrate compliance with the MS4 or TS4 permit.

First, applying 13.12(F)(6) in this way would reverse the method of ensuring a project will not cause undue pollution.

Criteria 1 and 1(B) aim to ensure projects will not cause undue water pollution. One way that they do this is by requiring projects to comply with applicable DEC regulations. This follows an assumption that if the project complies with regulations designed to prevent pollution, the project will likely not cause pollution. Further, an applicant can create a presumption of compliance with Criteria 1 and 1(B) by presenting a relevant DEC permit. 10 V.S.A. § 6086(d); Act 250 Rule 19(E). The permit is a shorthand way of showing that the project complies with underlying DEC regulations—again, with the assumption that complying with regulations will prevent pollution. Id. In short, we infer that a permit demonstrates compliance with regulations, and then infer that compliance with regulations will prevent pollution.

Vallee seeks to take the Court backwards through these inferences by pointing to a regulation that requires compliance with permits. The permits that Vallee cites, however, are much broader than, and outside of the scope of, the Project at issue here. See RDA Designation Sunnyside Brook Watershed, No. 141-11-16 Vtec, slip op. at 4–6 (Vt. Super. Ct. Envtl. Div. Dec. 22, 2017) (Walsh, J.); R.L. Vallee, Inc., et al MS4, No. 122-10-16 Vtec, slip op. at 2 (Vt. Super. Ct. Envtl. Div. May 2, 2017) (Walsh, J.). Following this reverse line of inferences would therefore potentially open the scope of review to matters irrelevant to the Project now before us. This does not help get to the core issue of whether the Project will cause undue pollution.

Because the scope of VTrans' authorization to discharge under the MS4 General Permit, and any future authorization under the TS4 General Permit, extend to VTrans infrastructure

across the state, it would be illogical to require VTrans to demonstrate compliance with these authorizations, generally, when for the most part they involve activities entirely unrelated to the Project area at issue here.

Finally, the language of Question 2(c) suggests that the Court carry out a retrospective analysis of Vtrans' compliance with the MS4 and TS4 authorizations. Such an analysis would be irrelevant to determining whether the Project proposed in this Act 250 application, which does not yet exist, will comply with the MS4 or TS4 authorizations. If a developer obtains a stormwater permit for a proposed project that does not yet exist, it is not possible for the developer to show the nonexistent project is complying with the stormwater permit in order to obtain an Act 250 permit.

For these reasons, we conclude that 13.12(F)(6) is not an "applicable [DEC] regulation" against which compliance with Criteria 1 and 1(B) is to be measured. VTrans' motion to dismiss Question 2(c) is therefore **GRANTED**.

### b. Act 250 Question 2(d): Criterion 1(B) and Compliance with the TS4 and MS4 Permits

Vallee's Act 250 Question 2(d) asks whether, "pursuant to Criterion 1(B), Condition 4 of VTrans' Act 250 permit must be amended to require compliance with the TS4 Permit as it is anticipated that the TS4 Permit will replace VTrans' MS4 Permit." Condition 4(c) of the Act 250 permit requires VTrans to "comply with all of the conditions of . . . Coverage under General Permit #3-9014," i.e. the MS4 General Permit. See RDA Designation, No. 141-11-16 Vtec at 4 (Dec. 22, 2017).

VTrans moves to dismiss this Question as unripe, because the TS4 authorization to discharge has not been issued. VTrans further argues that the condition is unnecessary, because the MS4 authorization already requires compliance with its terms, and the TS4 authorization will do the same.

As discussed above, it is not clear that the MS4 permit or TS4 permit are within the scope of Criterion 1(B), or Act 250 review in general.

Where a permittee offers a DEC permit as proof that a proposed project complies with an Act 250 criterion, it might make sense to condition the Act 250 permit on compliance with the terms of that DEC permit. Here, this logic does not apply, because VTrans does not offer the MS4

9

or TS4 permit as proof of compliance with any Act 250 criteria. Furthermore, as noted above, the MS4 and TS4 permits regulate activities that are much broader than the Project proposed here. Requiring compliance with the MS4 and TS4 permits would far exceed the scope of the Project.

The District Commission, and this Court sitting in its place, can impose reasonable conditions in an Act 250 permit to ensure that the permitted project complies with a given criteria. 10 V.S.A. § 6086(c); In re N. E. Materials Grp., LLC, 2017 VT 43, ¶ 36 (May 26, 2017), reargument denied (Sept. 22, 2017). Requiring the Project to comply with the MS4 or TS4 permit here is not a reasonable condition, because those permits regulate activities well outside of and beyond the scope of the Project.

Because requiring compliance with the TS4 permit would not be a reasonable condition, VTrans' motion to dismiss Question 2(d) is **GRANTED**. Furthermore, because compliance with the MS4 permit is not a reasonable condition, we **STRIKE** that condition from the Act 250 permit.

## VI. Act 250 Question 5(a): Criterion 5(B) and Vested Rights

Vallee's Act 250 Question 5(a) asks whether "the Project incorporate[s] and provide[s] safe access and connections to adjacent land and facilities and to existing and planned pedestrian and bicycle networks as required by Act 250, Criterion 5(B) by failing to provide a sidewalk or shared use path north of Mountain View Drive and/or adequate with shoulders throughout the project."

VTrans moves to dismiss this question based on vested rights. VTrans notes that Criterion 5(B) went into effect on June 1, 2014, and that in our summary judgment decision in this matter we noted that the District Commission decision on appeal here states that VTrans filed its Act 250 application on November 21, 2013. Diverging Diamond Interchange, Nos. 50-6-16, 169-12-16 Vtec at 35 (Oct. 11, 2017). VTrans therefore argues its application vested before Criterion 5(B) went into effect.

Vallee responds that the November 21, 2013 application was incomplete, and that a complete application for vesting purposes was not deemed complete until June 4, 2014.

On a motion to dismiss, we take the factual allegations of the nonmoving party as true. We therefore assume, for the purposes of this motion alone, it is possible that the application

vested after June 1, 2014.  VTrans' vested rights argument therefore fails, and its motion to dismiss Question 5(a) is **DENIED**.[4]

**VII.    Act 250 Question 6(a): Compliance with Criterion 10: Conformity with Local and Regional Plans**

Vallee's Act 250 Question 6(a) asks whether, under Criterion 10, the lack of a sidewalk or multi-use path north of Mountain View Drive fails to conform with the (1) Town of Colchester Plan, (ii) the Town of Colchester Official Map, (iii) the Town of Colchester Public Works Standards, (iv) the Chittenden County Regional Plan, (v) the Regional Bicycle Plan Update dated September 22, 2008, (vi) the AASHTO Guide for the Development of Bicycle Facilities, and (vii) the Vermont Pedestrian and Bicycle Facility Planning and Design Manual.  Question 6(a) goes on to state that the Court will have to determine which versions of some of these documents apply based on the Act 250 application's vesting date.

**a.    Criterion 10 only requires compliance with the Town Plan and Regional Plan.**

In our summary judgment decision, we explained that Criterion 10 does not require conformity "with respect to the detailed requirements of all ordinances, regulations and policies adopted in furtherance of" a town plan.  Diverging Diamond Interchange, Nos. 50-6-16, 169-12-16 Vtec at 33 (Oct. 11, 2017) (quoting Horizon Dev. Corp., No. 4C0841-EB, Findings of Fact, Conclusions of Law, and Order at 29 (Vt. Envtl. Bd. Aug. 21, 1992)).  We went on to note that because the Town Plan, in pertinent part, referenced "Zoning Regulations, Subdivision Regulations, and Public Works Standards and Specifications for guidance," we would look to those documents as aids in interpreting the Town Plan.

We again emphasize this point.  Criterion 10 requires projects to conform "with any duly adopted **local or regional plan** or capital program under 24 V.S.A. chapter 117."  10 V.S.A. § 6086(a)(10) (emphasis added).  Criterion 10 does not require the Project to conform with the Town of Colchester Official Map, the Town of Colchester Public Works Standards, the Regional Bicycle Plan Update dated September 22, 2008, the AASHTO Guide for the Development of Bicycle Facilities, or the Vermont Pedestrian and Bicycle Facility Planning and Design Manual.  Parts (ii), (iii), (v), (vi), and (vii) of Question 6(a) are therefore **DISMISSED**.

---

[4] Vallee has presented materials outside the pleadings to support its argument.  Because this matter is before us on a motion to dismiss, however, we have not considered these materials.  V.R.C.P. 12(b).

### b. Whether, under the Town Plan, the Project is a "development" that requires sidewalks and multi-use paths.

Vallee asserts in its response that we determined that the Project is a "development," insofar as the Town Plan requires new developments to include sidewalks and/or multiuse paths. Vallee Opp. to VTrans' Mot. Dism. at 25. This assertion is incorrect.

In our decision, we pointed to the following passage in the Town Plan:

> **[N]ew developments are required to include sidewalks and/or multiuse paths as well as provide easements for future pedestrian connections**. These requirements are found in the Zoning Regulations, Subdivision Regulations, and Public Works Standards and Specifications.

Diverging Diamond Interchange, Nos. 50-6-16, 169-12-16 Vtec at 32 (Oct. 11, 2017) (our emphasis) (quoting Town Plan at 80). We then noted that the Plan is ambiguous regarding whether a road project is a "development." Id. We concluded that even "[a]ssuming that the Project counts as a development solely for the purposes of analysis," we were unable to conclude that the Town Plan requires sidewalks on Route 2/7 in the Project area, as Vallee contended. Id. 32–35. At that time, we did not fully analyze whether the Project is a development for the purposes of sidewalks and multiuse paths, because it was not necessary to do so.

Because this issue is raised again, we revisit our earlier analysis.

We apply the rules of statutory construction in construing a town plan. In re Kisiel, 172 Vt. 124, 133 (2000) (citation omitted). The term "development" is not defined in the Town Plan. We therefore analyze the term in context of the Plan as a whole, and the chapter of the Plan in which it is found. Richards v. Nowicki, 172 Vt. 142, 149 (2001) ("We must read the sections of the regulatory scheme in context and the entire scheme in pari materia.") (citation omitted).

In the chapter on transportation, the Town Plan clearly distinguishes "developments" from "road projects." Town Plan at 82 ("**Developments, road projects, and all other plans** shall take into consideration the Official Map and should implement the proposed improvements to the greatest extent possible.") (emphasis added). Reading "road projects" here as being the same as "development" (or even as a subset of "development") ignores the separate terms. In re Miller, 2009 VT 36, ¶ 14, 185 Vt. 550 (in reading regulations and statutes, courts must assume that "all language . . . is inserted for a purpose," and therefore must not read a part of that

12

language as "surplusage or irrelevant") (citations omitted). This strongly suggests that "road projects" are something different from "development."

This suggestion is reinforced by the general language used in the Town Plan, which distinguishes road projects from developments.

For example, the Town Plan identifies certain things as developments, including "residential development," e.g. id. at 9, 67, 68, 69, 93, 94, "commercial development," e.g. id. at 9, 11, 22, 76, 81, 82, "industrial development," e.g. id. at 13, 17, 93, subdivisions (e.g. "New subdivisions and other developments," id. at 82), and planned unit developments ("Planned Unit Developments (PUDs) are a type of development", id. at 45).

Conversely, the Town Plan does not refer to roadways, sidewalks, or transportation infrastructure as "development." It instead refers to "transportation infrastructure," e.g. id. at 75, 76, 77, 79, 80, 82, "transportation system," id. at 75, 77, "[r]oadway construction and reconstruction projects," id. at 82, "infrastructure project," id. at 77, "road project," id., "traffic improvements," id. at 11, 12, 13, "pedestrian, bicycle, infrastructure, and roadway improvements," id. at 11, "transportation corridor improvements," id. at 13, "infrastructure improvements," id. at 13, 14, "construction projects such as the Exit 16 reconstruction project," id. at 77.

The Town Plan repeatedly uses the term "development" in proximity to, but distinct from, different terms used to describe transportation and infrastructure. E.g. Town Plan at 12 ("**Development** within this neighborhood should be in accordance with long-term plans for this area which include **pedestrian, bicycle, infrastructure, and roadway improvements**.") (emphasis added); id. at 13 ("many of these deficiencies will be addressed through the larger planned **transportation corridor improvements** to Exit 16. These **improvements** will be important to the area's continued growth as a commercial and industrial center. New **developments** and **redevelopments** should positively contribute to these planned **infrastructure improvements**.") (emphasis added); id. at 77 ("Sometimes . . . a **development** may be required to help implement **improvements** to the **transportation infrastructure** in order to offset adverse impacts caused by the **development**") (emphasis added).

13

Taken together, these examples illustrate a pattern where the use of "development" is set apart and distinguished from other terms used to describe road, sidewalk, and transportation infrastructure projects, like the Project now before the Court. For this reason, we conclude that the passage in question ("new developments are required to include sidewalks and/or multiuse paths as well as provide easements for future pedestrian connections") does not apply to the Project. The motion to dismiss Question 6(a) is therefore **GRANTED**.

## VIII. Stormwater Question 3: Site Balancing Procedure

Vallee's stormwater Question 3 asks whether it is "feasible for VTrans to meet the required treatment standards in the Vermont Stormwater Management Manual without relying on (in part or in whole) the Site Balancing Procedure for the Discharge of stormwater Runoff from the Expansion or Redevelopment of Impervious Surfaces."

VTrans points out that, pursuant to the 2011 Vermont Stormwater Management Manual, site balancing may be used based on practicability, not feasibility, and that Question 3 should be clarified to reflect this standard. In response, Vallee agrees. We therefore **GRANT** the motion to clarify Question 3, and modify the question by replacing the word "feasible" with "practicable."

## IX. Order

1. Timberlake's Act 250 appeal questions are **DISMISSED**.

2. To the extent that it raises non-stormwater-based chloride impacts, the motion to dismiss Act 250 Question 3(a) is **DENIED**. Otherwise, the motion to dismiss Questions 1(a), 1(b), 1(c), 2(b), 2(c), 2(d), 3(a), and 6(a) is **GRANTED**.

3. The motion to dismiss Act 250 Question 5(a) is **DENIED**.

4. The motion to clarify stormwater Question 3 is **GRANTED**, and the question is modified by replacing the word "feasible" with "practicable."

Following this decision, questions remaining for trial are:

Act 250 Questions 2(a), 3(a) (as limited by this decision), 4(a), 4(b), and 5(a).

- Act 250 Question 2(a): whether VTrans has satisfied Criterion 1(B) with respect to the issuance of an individual discharge permit.

- Act 250 Question 3(a): whether, pursuant to Criterion 1(E), the Project will fail to maintain the natural condition of Sunnyside Brook due to non-stormwater-based chloride impacts.

14

- Act 250 Question 4(a): whether a failure to provide sidewalks, a mixed use path, adequate bike lanes and crosswalks, or adequate width shoulders will cause unsafe conditions with respect to the use of highways and other means of transportation, existing or proposed, under Criterion 5(A).

- Act 250 Question 4(b): Whether the construction phasing or timeline of the Project's construction will result in unreasonable congestion or unsafe conditions under Criterion 5(A).

- Act 250 Question 5(a): whether the Project fails to comply with Criterion 5(B) due to the lack of sidewalk or shared use path north of Mountain View Drive, or due to inadequate shoulders throughout the Project.

Stormwater appeal Questions 1, 2, and 3.

- Stormwater Question 1: whether the Project satisfies requirements of Chapter 18, sections 302, 306, and 309 and by requirement therein, the Vermont Stormwater Management Manual, sections 1.1.1–1.1.5 and the requirements of 10 V.S.A. § 1264.

- Stormwater Question 2: whether the Project satisfies requirements of the Site Balancing Procedure for the Discharge of Stormwater Runoff from the Expansion or Redevelopment of Impervious Surfaces.

- Stormwater Question 3: whether it is practicable for VTrans to meet the required treatment standards in the Vermont Stormwater Management Manual without relying on the Site Balancing Procedure for the Discharge of Stormwater Runoff from the Expansion or Redevelopment of Impervious Surfaces.

**Electronically signed on February 08, 2018 at 10:02 AM pursuant to V.R.E.F. 7(d).**

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division